332 So.2d 834 (1975)
T. L. JAMES & CO., INC., et al.
v.
Mrs. Goldie Greig MONTGOMERY et al.
Mrs. Goldie Greig MONTGOMERY, Administratrix of the Succession of Thomas William Montgomery, Jr.
v.
Thomas William MONTGOMERY.
No. 56138.
Supreme Court of Louisiana.
December 8, 1975.
Dissenting Opinion December 23, 1975.
On Rehearing May 17, 1976.
Concurring Opinion on Rehearing May 18, 1976.
Concurring in Part and Dissenting in Part June 2, 1976.
*837 Pittman and Matheny, Hammond, by Iddo Pittman, Jr., James D. Johnson, Jr., and Eric L. Pittman, for Mrs. Goldie Greig Montgomery and Monty George Montgomery, applicants.
M. Truman Woodward, Jr., Kennedy J. Gilly, David Conroy, Hilton S. Bell, David L. Sigler, Milling, Benson, Woodward, Hillyer & Pierson, New Orleans, for amici curiae.
Charles O. Dupont, Allen M. Edwards, Plaquemine, William L. Kimball, Port Allen, for Thomas Wm. Montgomery, III, and Mrs. Sybil C. Montgomery, respondents.
Gerald Le Van, Baton Rouge, for amicus curiae.
SUMMERS, Justice.
Certiorari was granted, La., 310 So.2d 850, in these consolidated cases to review a decision of the trial court and Court of Appeal, First Circuit, 308 So.2d 481, holding that employee retirement and profitsharing plans with a named beneficiary are payable at death of the employee to the named beneficiary, and the value of the employee's interest in the plans at the time of his death are not subject to the claims of the surviving widow in community or the claims of forced heirs. The writ was also granted to review the decisions of this Court, holding that proceeds of a group term insurance policy payable to the beneficiary named by the insured are neither a part of the community property of the insured nor are its proceeds subject to the claims of forced heirs.

I.
Thomas W. Montgomery, Jr., was married to Sybil Chauvin on October 12, 1935. One child was born of this union on March 5, 1940, a son named Thomas W., III. Montgomery was employed by T. L. James & Company, Inc., on September 15, 1946. As an employee of the company, Montgomery became a participant in the company retirement plan for employees on December 31, 1949 and in the profit-sharing plan for employees on January 1, 1950. A group term life insurance policy insuring his life with Aetna Life Insurance Co. as an employee of T. L. James & Co. was issued on May 1, 1950. The marriage to Sybil Chauvin was dissolved by divorce on May 27, 1958, after which a partition and settlement of the community property was entered into between the parties on December 10, 1958.
Montgomery was married a second time to Goldie Greig on June 6, 1958, and one child was born of this marriage on March 25, 1960, a boy named Monty George. This second marriage was marked by several separations, one of which resulted in suit and a judgment of separation from bed and board on October 25, 1968. A reconciliation was brought about, however, and on September 3, 1969 the parties reestablished the community.
*838 Thereafter the parties separated again. During this last separation, on August 28, 1970, Montgomery delivered $11,940 in cash to his son Thomas III. The funds were deposited in a safety deposit box rented in the son's name. In quick succession, on August 31, 1970 Montgomery designated his son as beneficiary of the group term life insurance policy on his life which was issued to him by Aetna Life Insurance Co. as an employee of T. L. James & Company, Inc. He then designated Thomas III as beneficiary of the company retirement plan on September 2, 1970, and as beneficiary of the profit-sharing plan on September 24, 1970. Each of these latter designations superseded prior designations of Thomas III as beneficiary of the retirement and profit-sharing plans, which had been executed on August 26, 1968 and September 2, 1970, respectively. He then executed an act of donation to Thomas III of the insurance policy, his interest in the employee's profit-sharing plan and the retirement plan. This donation, executed before a Notary Public and two witnesses was never accepted by Thomas as donee. While Montgomery was bringing about these designations, suit was again instituted against him by Goldie Greig seeking a separation from bed and board. The matter was never brought to judgment, however, for on January 23, 1971 Montgomery committed suicide.
On April 19, 1971 T. L. James & Company, Inc., as administrator of the group term life insurance policy insuring the life of Montgomery, paid Thomas III $22,500 as named beneficiary, that amount being the policy's value at the time of Montgomery's death.
Then, on September 24, 1971, T. L. James & Company, Inc., having been informed that a disagreement had arisen between Thomas III, Sybil Chauvin, Goldie Greig and Monty George over the right to the benefits due under Montgomery's accounts in the employees' profit-sharing and retirement plans, provoked a concursus proceeding and deposited the sum of $63,875.44 in the registry of the court $26,330.14 of this amount represented proceeds from the profit-sharing trust, and $37,545.30 represented proceeds from the retirement plan for employees.
Subsequently Goldie Greig, as administratrix of the succession of the deceased Thomas William Montgomery, Jr., instituted suit on January 11, 1972 against Thomas III to recover the sum of $11,940, the cash given by the decedent to his son Thomas III; and for the sum of $22,500, the proceeds of the group term life insurance paid to Thomas III as beneficiary on account of the death of his father. In the alternative, she prayed for judgment in the amount of the premiums paid by the community of acquets and gains between herself and decedent, or, in the further alternative, that decedent's interest in these funds be decreed to belong to his estate.
The controversy involving the $11,940 in cash given to Thomas III has been resolved by a final judgment decreeing that those funds belonged to decedent's estate. The other issues are presented for decision.

II.

The Profit-sharing Plan
T. L. James & Company, Inc., first established a profit-sharing plan for its employees on January 1, 1945. The plan was restated in its entirety on December 31, 1955. It is designated as the T. L. James & Company, Inc., Employees' Profit-Sharing Plan.
The plan, insofar as it is pertinent here, was established and maintained for the purpose of enabling employees of the company, who are eligible to participate, to share in the profits of the company through the distribution to them or their beneficiaries of the corpus and income of a trust fund established and maintained in conjunction with the plan.
Only those persons whose customary employment with the company calls for not less than 20 hours of work in any one week *839 for not less than six months in any calendar year are eligible. They are referred to as participants.
Based upon a schedule established in the plan, the company obligated itself to contribute to the trust from the net profit a percentage progressing from 5% not in excess of $100,000 to 30% in excess of $500,000. The plan was amended in 1966 to provide for a company contribution of 20% of net profits after deducting 5% after taxes of the net worth of the company under conditions set forth in the amendment. The employee makes no contribution to the plan.
An advisory committee established by the plan is charged with maintaining a separate account for each participant. Each account is periodically adjusted on the basis of the fair market value of assets in the trust fund. The method of accounting is set forth.
Retirement or death brings about a determination of the percentage of the participant's account which is then vested. A schedule for this calculation graduates until after 20 years or more 100% of the account is vested in the participant. The funds are, in effect, dedicated to the employee, but are held in trust by the trustee. However, the funds cannot be withdrawn until resignation, retirement or death.
In conjunction with the establishment of the plan, the company entered into a trust agreement with a Shreveport bank, the trust to be administered in accordance with the trust agreement which is subject to amendment. Under the terms of the trust agreement the company may remove the trustee and appoint a successor. All contributions made by the company under the plan are paid into the trust fund established under the trust agreement, and all benefits payable under the plan are paid from the trust fund. The company has no right, title or interest in the trust fund or in any part thereof, and no part reverts to the company.
Company officers and employees are appointed as the advisory committee and administer the trust. They may direct the trustee to make loans to the employee participants under uniform terms to the value of the participants vested interest in his account. Loans may be made to participants to enable them to meet emergency conditions in their finances, on account of illness, disability, to preserve their home, or for the schooling of their children.
A participant may designate, revoke or change a beneficiary or beneficiaries. If a participant dies without designating a beneficiary, the committee may distribute the credit balance of his account to the next of kin or the legal representative or representatives of the estate of the last to die of the participant or the beneficiary.
No participant or other person shall have any interest in, or right to, any part of the trust fund, or in any of the assets thereof, except as provided in the plan.
No account in the fund is subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to do so shall be null and void; nor shall any such account be liable for, or subject to, the debts, contracts, liabilities, engagements or torts of the person entitled to the account.
The plan is subject to termination by the company at any time, and it may amend the plan in any respect at any time, provided that no part of the trust fund may be diverted from the exclusive benefit of the participants, their beneficiaries or their estates.

III.

The Retirement Plan for Employees
To implement the revision of the company's retirement plan T. L. James & Company, Inc., resolved on August 7, 1967 to adopt a new plan effective January 1, 1967, and directed that the company officers continue contributions to the trust for the plan. The new plan was a restatement and *840 continuation of the existing plan adopted by the company as of January 1, 1955 and the trust agreement entered into with a Shreveport bank at that time; the plan having been previously established on December 31, 1949. The plan is applicable to each employee in the active service of the company on and after January 1, 1967.
Employees are persons whose customary employment with the company calls for at least 20 hours of work per week for at least six months per year.
The monthly retirement income is based on the participant's final monthly compensation on his credited service. Normal retirement is retirement from the service of the company. Retirement pay, computed according to rules established in the plan, is payable, in the event of the employee's death after retirement, to his beneficiary or to the employee on retirement whether voluntary or because of disability.
Upon termination of service because of deathbefore retirement is otherwise due  the retirement benefits are payable to the designated beneficiary and are calculated on the employee's earnings over five consecutive years of the last ten he worked to arrive at an average monthly salary.
Ragan Odom, Personnel Manager of the company, explained that, like in the profit-sharing plan, all expenses, costs and investments in the retirement plan are paid by the company, but it is paid by the company because the participant is an employee of T. L. James. Only employees are included. Participation is based upon the employee's earnings and length of service. The funds are paid by the company "for his benefit"; the funds are "designated" to the employees.
The company actually takes tax deductions for the contributions it makes to the plan, a practice approved by the Internal Revenue Service and the Department of Labor. Once the contribution is made by the company, it is irrevocable.
As in the profit-sharing plan it is declared that no participant shall have any interest or right to or under the trust fund, except to the extent expressly provided in the plan.
Each participant may designate a beneficiary but if a deceased participant has not done so, the benefits are payable, in the discretion of the retirement committee, to the participant's surviving spouse, his descendants, parents, or heirs-at-law, or it may apportion the benefits among the group as the committee sees fit, or pay to the estate of the participant in its discretion.

IV.
The claims asserted here represent conflicts between the principles of community property and forced heirship on one hand and the contemporary pressures for freedom of disposition on the other.

The Community Property Claim
At the time of Montgomery's death he was married to Goldie Greig. The separation suit, although pending, had not been reduced to judgment. The community regime, then, was viable and in full force and effect. Joint tax returns for the years 1958 to the date of Montgomery's death indicate the earnings of both spouses increased during the marriage, the wife being employed as a librarian at Southeastern Louisiana University. She and Monty George, the son of the second marriage, both contend that all funds in both plans belonged to the community of acquets and gains and should be divided one-half to Goldie Greig and one-fourth each to Thomas III and Monty George.
It is fair to say from our resume of the plans that they represent compensation from the employer to the employee diverted to a trust fund and held for payment on death, retirement or disability. Inducements to adopt these plans usually arise because an employer has received loyal service over an employee's productive lifetime, *841 and the employer may feel constrained by human or moral considerations to offer him additional support during retirement years, or a trade union may seek and obtain these benefits as an additional compensation for services, a "fringe benefit."
Only the employer contributes to the plans, but the contribution is not without reciprocal contribution on the part of the employee, although these are intangible and difficult to evaluate. It is a reward by the company to promote loyal and efficient service on the part of the employee. The plans are, moreover, an inducement to employees to remain in the service of the company to enjoy the benefits the plans promised. In short, the contribution of the employer is not a purely gratuitous act, but it is in the nature of additional remuneration to the employee who meets the conditions of the plan. The employer expects and receives something in return for his contribution, while the employee, in complying, earns the reward. The benefits to the employee are, therefore, earned incomeproperty within legal contemplation. Langlinais v. David, 289 So.2d 343 (La.App.1974); Hamilton v. Hamilton, 258 So.2d 661 (La.App.1972); Laffitte v. Laffitte, 232 So.2d 92 (La.App.1970).
In both plans the employer retains considerable control by its authority to amend the trust agreement; to remove the trustee and appoint his successor; and by the appointment of the committee member who administers the plans. Significantly, however, once the employer's contributions to the plans are made they become irrevocably dedicated to the employee and, according to a schedule, vested in the employee. On the facts of this case, 100% of the account designated to Montgomery, because of the length of his service and his pay, was vested in him at the time of his death. The value of the proceeds at his death are the sums deposited in the registry of court. There is no dispute on this issue.
Any resolution of the problem must take into consideration the principles of community property so fundamental to Louisiana law. For "[e]very marriage contracted in this State, superinduces of right partnership or community of acquets or gains, if there be no stipulation to the contrary." La.Civil Code art. 2399. The partnership extends so far as to include nonresident married persons who acquire property in this State. La.Civil Code art. 2400.
Other principles established by the Civil Code are:
"This partnership or community consists of the profits of all effects of which the husband has the administration and enjoyment, either of right or in fact, of the produce of the reciprocal industry and labor of both husband and wife, and of the estate which they may acquire during the marriage, either by donations made jointly to them both, or by purchase, or in any other similar way, even though the purchase be only in the name of one of the two and not of both, because in that case the period of time when the purchase is made is alone attended to, and not the person who made the purchase. . . ." La.Civil Code art. 2402.
"At the time of the dissolution of the marriage, all effects which both husband and wife reciprocally possess, are presumed common effects or gains, unless it be satisfactorily proved which of such effects they brought in marriage, or which have been given them separately, or which they have respectively inherited. La.Civil Code art. 2405.
"The effects which compose the partnership or community of gains, are divided into two equal portions between the husband and wife, or between their heirs, at the dissolution of the marriage; and it is the same with respect to the profits arising from the effects which both husband and wife brought reciprocally in marriage, and which have been administered by the husband, or by husband and wife conjointly, although what has been thus brought in marriage, by *842 either the husband or the wife, be more considerable than what has been brought by the other, or even although one of the two did not bring anything at all." La.Civil Code art. 2406.
"When the separate property of either the husband or the wife has been increased or improved during the marriage, the other spouse, or his or her heirs, shall be entitled to the reward of one half of the value of the increase or ameliorations, if it be proved that the increase or ameliorations be the result of the common labor, expenses or industry; but there shall be no reward due, if it be proved that the increase is due only to the ordinary course of things, to the rise in the value of property, or to the chances of trade." La.Civil Code art. 2408.
These articles of the Civil Code represent distinctive and enduring principles of our Civil Law system, a highly developed and more evolved concept of the rules regulating the marriage relation than almost any other body of laws on the subject.
"The Civil Law ideal of the marital relation, far kinder than the Common Law notion of a merged personality represented by the husband, has throughout the regulations of the community kept a more perfect balance between the rights of the spouses in their accumulations through the years. Furthermore, the strong framework which supports the community property edifice will permit of the minor adjustments necessary for perfect alignment with changing conditions." Daggett, The Community Property System of Louisiana. Chapter 1 (La.State Univ.Press 1945).
Until now, of the community property systems existing in the United States, that of Louisiana seems most basically sound, most equitable in its variations, possibly because it is true parent stock and has been least weakened by the influence of the Common Law idea of marital rights. Daggett, ibid.
Some historians believe the principle of community property originated in the ancient Germanic tribes when women fought by the side of men and for that reason were believed to be entitled to part of the spoils of war.
Even if the ancient causes which brought about the community property system as it exists in Louisiana no longer exist and are incompatible with the stresses for change, the existence of these stresses would not authorize courts of justice to refuse giving effect to the law. But fortunately this is not the case. Indeed, in this day and time women have to a great extent, because of economic and social changes, entered into industry and business, often sharing the burden of providing for the needs of the marital partnership. This change provides a cause, more prevalent than before, attesting to the relevance, and supporting the continuation and preservation, of the community property system.
In a case involving a controversy between a husband and wife over a partition in kind of shares of stock standing in the husband's name, the husband contended the stock should not be divided in kind, but that he should be allowed to retain all of the stock and pay to his wife one-half of its book value. To support his contention he refers to a provision of the charter of the company issuing the stock which requires that before the stock is transferred it be first offered to the shareholders of the company or its officers, a provision designed to restrict ownership of the shares to the employees and officers of the company.
In denying the husband the right to the stock to the exclusion of the wife, and after quoting Articles 2399 and 2402 of the Civil Code, this Court in Messersmith v. Messersmith, 229 La. 495, 86 So.2d 169 (1956), said:
"There is nothing more fundamental in our law than the rule of property which declares that this community is a partnership in which the husband and wife own equal shares, their title thereto *843 vesting at the very instant such property is acquired. (citations omitted).
"We have repeatedly adhered to the doctrine that the half ownership of the wife in the community effects, its status not resting upon the mere gratuity of the husband, is entitled to a dignity equal to that of the husband's; and upon its dissolution and liquidation the wife is entitled to secure the delivery of this one-half right and ownership into her own exclusive management and control; and the courts have no discretion or power whatever to award her less.
"Our codal laws also declare that after the marriage the spouses can do nothing to alter the effect between themselves of our community laws. LSA-C.C. 2329."
The case also stands for the proposition that the restrictive provisions of the company charter cannot affect the status of the stock purchased during the existence of the community or the rights of the wife which flow from the partnership or community of acquets and gains created by the marriage, the Court saying:
"Such a restriction cannot negative the wife's present interest as a co-owner, and as a co-owner in community she is clearly entitled to be recognized as such and obtain the exclusive management and control of her vested interest."
This holding means that in the case at bar the stipulations of the plans cannot alter the wife's rights as a partner in community.
The Messersmith Case also involved classification of an individual employee's certificate issued by Equitable Life Assurance Society, the certificate being identified with a group annuity plan of the company. Notwithstanding that the certificate had no cash surrender or loan value on the date of dissolution of the community, and would never have a cash or loan value until resignation, retirement or death of the employee, this Court found the certificate to be an asset of the community, an incorporeal moveable from which benefits flow, which must be inventoried and in time partitioned between the spouses.
In Bender v. Pfaff, 282 U.S. 127, 51 S.Ct. 64, 75 L.Ed. 252 (1930), the United States Supreme Court recognized that under the law of Louisiana the wife is not only vested with the ownership of half of the community property from the moment it is acquired, but is likewise the owner of half of the community income. See also Succession of Wiener, 203 La. 649, 14 So. 2d 475 (1943).
Article 2334 of the Civil Code reinforces the doctrine expressed in the articles and decisions already referred to:
"The property of married persons is divided into separate and common property.
"Separate property is that which either party brings into the marriage, or acquires during the marriage with separate funds, or by inheritance, or by donation made to him or her particularly.
. . . . . .
"Common property is that which is acquired by the husband and wife during marriage, in any manner different from that above declared. . . ."
Although the husband is, by the articles of the Code, placed at the head of the partnership, the status of the wife as a partner and her ownership of half of the community property from the instant of its acquisition is unaffected. Succession of Wiener, supra. As expressed in Poe v. Seaborn, 282 U.S. 101, 51 S.Ct. 58, 75 L. Ed. 239 (1930), "The law's investiture of the husband with broad powers, by no means negatives the wife's present interest as a co-owner."
The theory of this community partnership is that necessity and order require that it be placed in charge of a managing partner. For one thing, dealings with third persons, when community property is involved, had to be protected from the nullifying actions of the other spouse, or the stalemate otherwise resulting from disagreement between the partners. In effect, *844 the confusion resulting from dual control had to be avoided.
"It is obvious, therefore, that the wife's interest in the community property in Louisiana does not spring from any fiction of the law or from any gift or act of generosity on the part of the husband but, instead, from an express legal contract of partnership entered into at the time of the marriage." Succession of Wiener, supra.
Notwithstanding that the husband is by law the head and master of the marital relationship and is charged with the management and control of the community of acquets and gains, the wife's one-half interest is at all times real, vesting in her the right to dispose of her interest by will and giving her the right to demand her one-half interest upon dissolution of the marriage for any cause, even though she is at fault in the separation or divorce.
It must be recognized, therefore, that plans or devices between employer and employee cannot have the effect of nullifying the wife's rights. There is no intimation in the case at bar, however, that the employer sought by the profit-sharing or retirement plan to nullify the law designed for the protection of the wife or of forced heirs. To the contrary, it seems apparent that the plans recognize the contribution the wife makes to the employee's contentment, stability and efficiency in his employment, and the design of the plan is to foster and encourage the employee's security. Expediency or simplicity of procedure in the settlement of the benefits upon the beneficiary at the death of the employee is the objective of the designation of beneficiary provision of the plans and the reason for granting authority to the committees to make the distribution in the absence of a designated beneficiary.
But, as we have seen, this Court has heretofore decided, that restrictive provisions in corporate charters, and, by analogy, in profit-sharing and retirement plans of the employer, "cannot negative the wife's present interest as a co-owner." Messersmith v. Messersmith, 229 La. 495, 86 So.2d 169 (1956)
Demands for efficient and expeditious settlement under these plans cannot outweigh or have the effect of nullifying the strongly entrenched and viable community property system existing in this State. These demands overlook fundamental principles of our law, which, if disregarded, can only lead to the erosion and eventual nullification of community property and forced heirship principles. Piecemeal adjudications based upon demands for expediency and freedom of disposition will result in confusion and instability in the law. If this result is to be brought about, the Legislature must undertake the change, not courts.
Moreover, nothing in the community property system is found which encumbers or deters the operation of the plans before us. When questions arise over the disposition of the proceeds after the death of the employee or upon termination of the marriage, the matter can be resolved as in other cases of controversy which are resolved by the courts. In the case at bar the employer properly provoked this concursus to resolve the question.
We recognize the prior jurisprudence of this Court, and its incorporation in Section 647 of Title 22 of the Revised Statutes, which holds, in life insurance cases, that the right to receive benefits is an incorporeal thing, La.Civil Code art. 770, and the proceeds of life insurance are therefore payable to an insured's estate as separate property if the policy was brought into the marriage, In re: Moseman's Estate, 38 La.Ann. 219 (1886), or community property if the policy was acquired during the marriage. Sizeler v. Sizeler, 170 La. 128, 127 So. 388 (1930); Succession of Rabouin, 201 La. 227, 9 So. 2d 529 (1942); Succession of Buddig, 108 La. 406, 32 So. 361 (1902).
*845 It is the reasoning in these cases that this right to receive benefits constitutes an interest in the insurance contract which becomes vested at the moment the contract comes into existence. Succession of Verneuille, 120 La. 605, 45 So. 520 (1908). Nevertheless, when the insured names a beneficiary, the proceeds do not form any part of the insured's estate at his death. Succession of LeBlanc, 142 La. 27, 76 So. 223 (1917); Succession of Mendoza, 288 So.2d 673 (La.App.1974) (Lemmon, Jr., concurring).
However, life insurance has always been treated as sui generis in this State. For this reason this Court has established a theory that the rules of law found in our Civil Code and the principles of forced heirship found in our Constitution and in the Civil Code do not apply to life insurance. The concept, as already pointed out, has been embodied in our statutory law. La.R.S. 22:647; Oppenheim, The Donation Inter Vivos, 43 Tul.L.Rev. 737 (1969). Clearly the theory of these cases establishing the proposition that the proceeds of an insurance policy are not subject to collation make it possible to favor one forced heir over another, La. Const. art. IV, 116 (1921); La.Const. art. XII, § 5 (1974); Vinson v. Vinson, 105 La. 30, 29 So. 701 (1901), and sanction a life insurance device which may, when properly employed, nullify the effects of the community of acquets and gains. Succession of Geagan, 212 La. 574, 33 So.2d 118 (1947).
But this Court has refused to extend the rationale of the cases dealing with life insurance to other problems where the conflict is between the urge to bring about freedom of disposition and the fundamental and elementary principles of forced heirship and the community property system embodied in our Constitution and Civil Code.
Thus, where a decedent purchased United States Series "G" Savings Bonds and designated his brother as payee on death, and upon his death left a widow and posthumous child, and the widow sued for delivery of the proceeds or judgment for the value of the bonds, we granted judgment in favor of the widow, saying the designation of the brother constituted a donation mortis causa, as defined by Article 1469 of the Civil Code. As such it was a gift in contemplation of death and subject to State Inheritance Tax. Winsberg v. Winsberg, 220 La. 398, 56 So.2d 730 (1952).
The decision in the Winsberg Case found that, whereas such a gift was a disposition mortis causa, it has no standing under our law as it does not comply with any of the forms prescribed for testaments by Articles 1574-95 of the Civil Code, concluding:
"Accordingly, it would be absolutely null but for the vitality given it by law under which the bonds were issued. This Federal contract, which is a recognition by the Government of its obligation to the purchaser of the bond for a sum certain in money to be paid on his death to a designated person, is, of course, enforceable between the parties thereto in accordance with the conditions stated therein. And, obviously, we think, Louisiana is without right to change the beneficiary of the contract or to insist that the Federal Government recognize someone other than the payee as the owner of the bonds. . . .
"But though these contracts are entitled to recognition as another way to dispose of property in prospect of death, it does not follow that they may be employed so as to nullify the laws applicable to the devolution of property or to confer upon the donees greater rights than they would have had if the devise has been in the form of a last will and testament. It is apt to observe that the Federal Government is neither concerned with nor interested in the application and enforcement of State laws respecting succession or inheritance of property. . . .

*846 "So we say in this case the defendant cannot be accorded greater rights, merely because the donation is in the form of a Federal contract, than he would have had it been by last will and testament as prescribed by our law. And, while Louisiana may not require that bonds be paid to anyone other than the named beneficiary, it undoubtedly has the power, which was reserved to it by the Tenth Amendment of the Federal Constitution, to decree that the beneficiary or payee is indebted to the estate of the former owner, or his heirs, in an amount equal to the value of the gift."
The principle has been upheld by decisions of our Nation's highest court. They concede that while Federal law may govern as to form, Federal law cannot be used as a means of defrauding heirs under state law. Yiatchos v. Yiatchos, 376 U.S. 306, 84 S.Ct. 742, 11 L.Ed.2d 724 (1964); Free v. Bland, 369 U.S. 663, 82 S.Ct. 1089, 8 L. Ed.2d 180 (1962).
Life insurance is distinctive both in its confection and in its effect. For instance, "An examination of the authorities does not warrant the conclusion that an annuity contract is an insurance contract . . . An annuity comprehends few of the elements of an insurance contract." Carroll v. Equitable Life Assurance Society of United States, 9 F.Supp. 223, 224 (W.D.Mo.1934); Succession of Rabouin, 201 La. 227, 9 So. 2d 529 (1942). Annuity contracts are recognized as investments rather than as insurance. Appleman on Insurance, Section 83.
Considering Louisiana's long and steadfast commitment to the principles of forced heirship and community property, this Court is unable, even if it thought a better result would be to consider profit-sharing and retirement plans analogous to insurance, to adopt any theory of decision which would erode those principles, and, under certain circumstances, nullify them.
Thus, under the facts of this case, the benefits or proceeds of the profit-sharing and retirement plans are, in effect, and in reality, principally earnings of the deceased employee Montgomery. As such the proceeds of these plans were "the produce of the reciprocal industry and labor of both husband and wife." La.Civil Code art. 2402.
At the time of the dissolution of the marriage by Montgomery's death, therefore, these benefits were "presumed community effects or gains," ibid. art. 2405, and are to be divided into two equal portions between the surviving wife and the heirs of the deceased husband. Ibid. art. 2406. To bring about this result the proceeds of these plans are payable to Goldie Greig as administratrix of the succession of the deceased Montgomery.
However, the forced heirs of the decedent and his first wife are entitled to an accounting to support any claim that some value of these benefits existed prior to the second marriage. In the event such a contention is supported, the claims of the forced heirs and the first wife that this value is attributable to the first community must be given effect. This accounting is to be based upon the value, if any, of the account designated for Montgomery which had vested prior to the second marriage. Daigre v. Daigre, 228 La. 682, 83 So.2d 900 (1955), opinion on rehearing, holding that if a pension is part of the consideration for services of the employee, "then it unquestionably becomes a community asset." See also Succession of Lewis, 192 La. 734, 189 So. 118 (1939).

V.
Although the question does not seem to be contested, the record shows that Montgomery had designated his older son as the beneficiary of the proceeds of both plans on a written form provided by the committee, the designations were not in testamentary form. These are undoubtedly dispositions in contemplation of death. This being so, the question arises whether such a gift is unlawful in Louisiana since it is not in the form of a will, nor is it a part of a life insurance contract, for Article *847 1570 of the Civil Code provides that all dispositions mortis causa be made by testament and abrogates all other forms. See also La.Civil Code arts. 1571-95. No law is found which permits superimposing this form for the disposition of Montgomery's property after death over the forms prescribed by the Code for dispositions mortis causa. Therefore, the designation of Thomas III as beneficiary of the two plans is without effect.
Nor can the law give effect to the donation inter vivos executed by Montgomery in which he gave his interest in the plans and insurance policy to his son Thomas III. Aside from the fact that the donations were never accepted by the donee as the law requires, La.Civil Code art. 1540, the question arises whether Montgomery could then dispose of the plan benefits which could only be availed of upon resignation, retirement or death. Houghton v. Houghton, 165 La. 1019, 116 So. 493 (1928).

VI.

The Life Insurance Policy
The life insurance policy in question is a term policy with no cash surrender value, furnished to decedent as an incident of his employment under a group plan with Aetna Life Insurance Company. Both the employee and the employer made payments of premiums, the company's records indicating that the decedent paid $.50 per month for each $1,000.00 unit of coverage since 1965. (The records prior to 1965 were unavailable.) In 1965, the coverage amounted to $15,000.00. It was changed in 1970 to $22,500.00.
The proceeds were paid to the older son as designated beneficiary. In this lawsuit, the second wife seeks their recovery.
It is well-settled in Louisiana that the proceeds of life insurance, if payable to a named beneficiary other than the estate of the insured, are not considered to be a part of the estate of the insured. They do not come into existence during his life, never belong to him, and pass by virtue of the contractual agreement between the insured and the insurer to the named beneficiary. Succession of Rabouin, 201 La. 227, 9 So.2d 529 (1942); Sizeler v. Sizeler, 170 La. 128, 127 So. 388 (1930). Life insurance proceeds are not subject to the Civil Code articles relating to donations inter vivos or mortis causa, nor are they subject to community claims or the laws regarding forced heirship.
The second wife of decedent, Goldie Greig, urges this Court to re-examine these rules. She contends that they provide a vehicle whereby a husband can separate life insurance proceeds from his estate, thus circumventing the laws relating to community property and forced heirship.
The jurisprudential rule has now been incorporated in our statutory law. See La.R.S. 22:647. It can no longer be changed by court decision, even if we were inclined to do so.
As already noted, this insurance policy was acquired before decedent's marriage to his second wife, and thus was part of his separate estate. No restitution is due the community for the premiums paid by decedent. In such a case, a community claim is supportable only when the cash value of the policy has increased during the community's existence, and then only for one-half the extent of the increase in value. The policy before us is a term insurance policy, which never had a cash surrender value. Therefore, no accounting is due the community. Butler v. Butler, La.App., 228 So.2d 339 (1969).
The wife's claim to the insurance proceeds is without merit.
For the reasons assigned, the judgment of the Court of Appeal is reversed in the concursus proceeding involving the status of the proceeds of the profit-sharing and retirement plans, and it is ordered that the *848 funds on deposit in the registry of the court be delivered to the administratrix of the estate of Thomas W. Montgomery, Jr., to be divided one-half to Goldie Greig, the surviving spouse in community, and one-fourth each to Thomas W. Montgomery III and Monty George Montgomery, subject to such adjustments as are warranted by an accounting to Sybil Chauvin, the wife of the first marriage, and to the forced heirs for the value of the plans which was vested during the first marriage. In the consolidated suit involving the claim of the administratrix for return of the proceeds of the life insurance policy to the estate of the deceased, the judgment of the Court of Appeal is affirmed.
SANDERS, C.J., concurs in part and dissents in part and assigns written reasons.
MARCUS, J., concurs in part and dissents in part.
SANDERS, Chief Justice (concurring in part and dissenting in part).
The issues before us in these consolidated cases are: (1) whether the proceeds from profit-sharing and retirement plans are payable to a named beneficiary other than the surviving spouse, and (2) whether the proceeds of a life insurance policy provided in connection with employment are payable to the named beneficiary who is not the surviving spouse.
I agree with the majority that the proceeds of the life insurance policy are payable to the named beneficiary.
I disagree, however, with the disposition of the proceeds of the profit-sharing and retirement plans. I would likewise hold that the proceeds of these plans are payable to the designated beneficiary.
The leading case on this issue is Succession of Rockvoan, La.App., 141 So.2d 438 (1962). In Rockvoan, the decedent designated his son by his first marriage as the beneficiary of the death benefits of his retirement plan; the litigation arose when his second wife, who was the administratrix of his succession, contended that the payment belonged to the community of acquets and gains between the decedent and herself. As in the present case, decedent had entered into the plan prior to his second marriage.
The court in Rockvoan rendered judgment in favor of the designated beneficiary, basing its decision on the rationale that the death benefit provision of the retirement fund was so closely analogous to life insurance as to render the law relative to life insurance applicable. The court found especially significant the fact that the proceeds of the fund did not come into existence during the lifetime of the employee, and thus did not at any time belong to him so as to form a part of his estate, either separate or community. I think the court's reasoning in Rockvoam is correct.
In the present case, I note that the funds were actually owned by the trust which was administered by the bank as trustee; neither the employer nor the employee at any time had a right of ownership in the funds. The employee's right was solely a contractual right against his employer, subject to the contingencies of retirement, disability, or death. The contractual right remained unenforceable until the happening of one of those contingencies.
Appellant argues that the fact that decedent had control over at least one of the contingencies which would have rendered his contractual right enforceable, i.e., the date of his retirement, should alter the result because his rights of the funds had thus already "vested" in him. The decision in Succession of Mendoza, La.App., 288 So. 2d 673 (1973), turned on this distinction. However, I find the distinction to be insupportable. The approach used by the Fourth Circuit Court of Appeal in Lynch v. Lawrence, La.App., 293 So.2d 598, writs refused, La., 295 So.2d 809, 814 (1974), is more consistent with my view. In Lynch, the circumstances which gave rise to the *849 litigation were different, being the partition of the community pursuant to a divorce decree. Additionally, the plan in Lynch was acquired during the marriage and was community rather than separate property. The court held that the wife had a right to an undivided one-half interest in the deferred pension plan that had vested prior to the dissolution of the community, but that the husband was not required to begin paying this indebtedness until he began to receive the payments himself. Furthermore, the court held that the amount of the wife's portion of the monthly pension payments could be substantially reduced or extinguished by the husband's death. In Lynch, the husband had reached the age at which he could retire at any time at full pension before the dissolution of the community.
Applying the reasoning of Lynch to the instant case, the wife's right to an accounting for the enhancement of the decedent's separate estate through its receipt of pension payments never came into existence, and was prevented from ever reaching fruition by his death.
In most, if not all, of the other states, employee benefits pass by contract right, never becoming a part of the employee's succession. See, e.g., Buehler v. Buehler, Tex.Civ.App., 323 S.W.2d 67 (1959); Kansas City Life Insurance Co. v. Rainey, 353 Mo. 477, 182 S.W.2d 624 (1944); Toulouse v. New York Life Insurance Co., 40 Wash.2d 538, 245 P.2d 205 (1952); In re Koss' Estate, 106 N.J.Eq. 323, 150 A. 360 (1930). The theories most often relied upon in other jurisdictions are: (1) the designated party is a third party beneficiary of the contract between the employer and employee, or (2) such pension funds create valid inter vivos trusts. See Hart v. Savings and Proft Sharing Fund of Sears, Roebuck & Co., 291 F.Supp. 95 (E.D.Va. 1968).
Apparently, the majority holds that the profit-sharing and retirement plans are assets of the second community, though the plans were established during the first community. In so holding, the majority deviates from the jurisprudence that the time the plan is taken out is controlling. See Daigre v. Daigre, 228 La. 682, 83 So.2d 900 (1955); Succession of Mendoza, La.App., 288 So.2d 673 (1973); Langlinais v. David, La.App., 289 So.2d 343 (1974). If I were to reach the question, I would adhere to the existing jurisprudence.
Admittedly, the present case is difficult because of a collision between the Louisiana Civil Code concepts and the widely used contractual employee systems. I greatly fear that the majority decision will impair the operation of these systems, as well as subject the benefits to the federal estate tax contrary to the salutary purpose of the systems.
For the reasons assigned, I respectfully dissent.

ON REHEARING
TATE, Justice.
We granted rehearing primarily to reconsider what effect, if any, should be given to the contractual designation of a beneficiary to the profit-sharing and retirement fund proceeds. We held these proceeds by our opinion to be in the nature of deferred compensation (additional remuneration) to the employee for his labors during his working lifetime. (That last holding we reiterate and amplify by our present opinion on rehearing.)
Procedural Context
This issue arises in a concursus proceeding, La.C.Civ.P. art. 4651. It was filed by the employer (T. L. James) and by those administering retirement and profit-sharing plans existing by contractual agreement between T. L. James and its employees.
The plaintiffs deposited into court $26,330.14 proceeds from the profit-sharing trust and $37,345.30 proceeds from the *850 retirement plan, a total of $63,875.44. These sums represent the total value of the credits in the respective plans to the accounts of T. W. Montgomery, Jr., deceased, a former long-time employee of T. L. James.
Cited as defendants were: the contractually-designated beneficiary (T. W. Montgomery, III) of the plans; the decedent's surviving spouse (Mrs. Goldie Greig Montgomery); Monty George Montgomery, a minor forced heir (through a curator); Mrs. Sybil Montgomery, the decedent's former wife by the first marriage which ended in divorce; and the succession of the decedent (through its administratrix). All were cited as having opposing claims to such proceeds.[1]
By our original opinion, we reversed the decisions of the district and intermediate courts. These previous decisions had recognized the contractual beneficiary's rights to receive the proceeds, free and clear of any claim that his receipt of them infringed upon the rights of forced heirs or of the present and former spouses who had lived in community with the decedent.
In this opinion on rehearing, we do not depart from the basic rationale of our original opinion, which held that the contractual agreement between T. L. James and its employee could not prejudice the community rights of the decedent's spouses, nor the rights of his forced heirs to their legitime. However, we do clarify the respective rights of the contractual beneficiary, the forced heirs, and the former spouses to the value of the funds attributable to their respective communities.
Factual Context
The facts are more fully set forth in our original opinion. Insofar as relevant to our discussion, they may be summarized as follows:
The decedent, Thomas W. Montgomery, Jr., was married to Sybil Chauvin (former spouse) from 1935 to their divorce in 1958, and to Goldie Greig (surviving widow) from 1958 to his death in 1971. One son, Thomas III, was born during the first marriage and another, Monty George, during the second.
The decedent was employed by T. L. James from 1946 to his death. During his first marriage, he became a participant in the company's retirement and profit-sharing plans, which apply to all employees. At the time of dissolution by divorce of the first community, the wife's interest in the funds, if any, was not partitioned or settled between the spouses.
In 1970, his first son Thomas III was named the beneficiary of both plans. However, because a dispute arose as to who was entitled to the proceeds of the plan, T. L. James provoked a concursus proceeding and deposited the proceeds in the court registry.
Under the terms of the decedent's contracts with the respective group plans, the right of the decedent or his beneficiaries to receive any proceeds do not contractually vest until his death, retirement, or resignation from company employment. A separate account for each employee is maintained, to which annual increments are paid by the company based upon employment. At any given time, each employee's account is valued according to its share in the assets of the respective plans, based upon contractual formulae applicable to all employees.
The employee is given the right to designate a contractual beneficiary to whom *851 the proceeds are to be paid. The plans further provide that no person shall have a right to the funds except as provided by the plan, which further prohibits anticipatory assignment, sale, or pledge.
Summary of our Original Holding
For the reasons stated at greater length in our original opinion, we adopt and affirm its conclusions, and their necessary implications, in the following respects:
1. The contribution of the employer into these plans is not a purely gratuitous act, but it is in the nature of additional remuneration to the employee who meets the conditions of the plan. The employer expects and receives something in return for his contribution, while the employee, in complying, earns the reward. The credits to these plans, when made, are in the nature of compensation (although deferred until contractually payable).
2. Each contribution of the employer to the funds entitles the employee or his beneficiary to share subsequently in the funds' proceeds; when made during the community, the property right to share ultimately in the proceeds thereby acquired by the wage earner, is "acquire[d] during the marriage", Civil Code Article 2402 and is thus a community asset. Civil Code Article 2334; Messersmith v. Messersmith, 229 La. 495, 86 So.2d 169 (1956). Therefore, the value of the right to share proportionately in the fund, which right is contractually acquired by virtue of each contribution, falls into the community during which the contribution is made; for by each contribution, when made, the employee (or his beneficiary or estate) has acquired a right to share pro rata in the proceeds ultimately payable from the funds to the employee or his contractual beneficiary or his estate.
3. The value of the right to share in the retirement and profit-sharing funds is an incorporeal, movable right. When acquired during the existence of a marriage, the right-to-share is a community asset which, at the dissolution of the community, must be so classifiedeven though at the time acquired or at the time of dissolution of a community, the right has no marketable or redeemable cash value, and even though the contractual right to receive money or other benefits is due in the future and is contingent upon the happening of an event at an uncertain time. Messersmith v. Messersmith, 229 La. 495, 86 So.2d 169, 174-75 (1956). When a community is dissolved, the employee's spouse is thus entitled to be recognized as the owner of one-half the value of the right-to-share, insofar as attributable to the contributions paid into the fund as deferred compensation to the employee during the existence of the community (i.e., even though it may not by the contract be payable at that time).[2] Id.; Laffitte v. Laffitte, 253 So.2d 120 (La.App.2d Cir. 1971), noted 33 La.L.Rev. 222-23 (1973). However, when the proceeds do become payable under the contract to the employee or his beneficiary or estate, the spouse is entitled at that time to receive payment as owner of her share of the proceeds, based upon the value of the right-to-share acquired *852 during the community formerly existing between her and the wage earner.
4. For the reasons more fully set forth in our original opinion, we are unwilling to extend by analogy the principles applicable to the purchase of life insurance policies to the acquisition of community interests in retirement or profit-sharing funds such as those at issue. Jurisprudentially, as confirmed legislatively, life insurance interests are treated sui generis as an exception to the usual rules of acquisition of property interests during a community.[3]
5. Therefore, we cannot recognize a contractual agreement (the plans in question) between the wage earner and a third person (his employer and the plans in question) to pay a contractual beneficiary the proceeds, insofar as such payment would (in the absence of legislative authorization) divest the employee's spouse of a present interest as a co-owner of the right to share in the proceeds acquired during the community.
6. For similar reasons, we cannot recognize such a contractual agreement insofar as, by recognizing it, the payment to the beneficiary would infringe upon the legitime of a forced heir. See: Succession of Rabouin, 201 La. 227, 9 So.2d 529 (1942). See also Jochum v. Estate of Favre, 313 So.2d 870 (La.App.4th Cir. 1975).
7. The decedent's attempt by notarial act of donation to donate his entire interest in the funds to his son by his first marriage is ineffective. It is invalid, not only because of the contractual prohibition in the plans which prevent such divestiture but also because the donation was not accepted by the son during the decedent's lifetime. Civil Code Articles 1536, 1540; 1 Litvinoff on Obligations, Section 164 (6 Civil Law Treatise, 1969). See also Planiol, Civil Law Treatise, Volume 3, Section 2567 (LSLI translation, 1959).
Apportionment of the ownership of the proceeds when they become contractually payable
In our original opinion, we did not specifically set forth the method of determining what share of the funds was attributable to each of the communities with an ownership interest in them. As noted, the right-to-share acquired during the community (arising from each contribution made during the marriage) does not contractually vest until the employee's death, retirement, or withdrawal from employment. At that time, however, when under the plans a contractual right vests in the employee or his beneficiary or estate to receive proceeds from funds, the following method of apportionment to the respective communities and to the employee's separate estate is implicit in our original opinion: The value of each contribution paid into the fund shall be a share of the fund of the same proportion that the contribution's amount bears to the total amount of all contributions paid into the fund to the employee's account.
With regard to the present case, what this means is that the total contributions paid into the employee's accounts shall be divided into three classifications: (a) those made during the first community; (b) those made when the deceased employee was not married; and (c) those made during the second community.
In accord with these classifications, when the proceeds of the fund become payable (to the employee, his beneficiary, or his estate) under the contract, the proceeds attributable to the employee's account shall *853 (if adverse claim is made against the beneficiary) be apportioned as
(a) owned by the first community (one-half to each spouse),
(b) owned by the husband's separate estate, and
(c) owned by the second community (one-half to each spouse),
in the same proportions that the original contributions made during the respective classification periods bear to the total contributions made during the decedent's lifetime.
This, we believe, is in accord with jurisprudential principles developed by the intermediate courts in apportioning each spouse's ownership rights in plans funded similarly to the presentin which, similarly, by way of deferred compensation for his services, the employee (or his beneficiary or estate) received the right to share in the proceeds at some future event, such as at his death or retirement. These intermediate decisions have received approval by way of scholarly commentary, and they are based upon the civil code articles regulating community property and upon our decisions, such as Messersmith above-cited, applying them to analogous property rights. These decisions and their approving scholarly commentary include: Lynch v. Lawrence, 293 So.2d 598 (La.App.4th Cir. 1974), certiorari denied ("no error of law"), 295 So.2d 809 (La.1974), noted approvingly by Professor Robert A. Pascal, 35 La.L.Rev. 208-09 (1975); Langlinais v. David, 289 So.2d 343 (La.App.3d Cir. 1974); Hamilton v. Hamilton, 258 So.2d 661 (La.App.3d Cir. 1972); Laffitte v. Laffitte, 253 So.2d 120 (La.App.2d Cir. 1971) (on further review) and 232 So.2d 92 (La.App.2d Cir. 1970), noted approvingly (Professor Pascal) 33 La.L.Re v. 222-23 (1973) and 31 La.L.Rev. 253-54 (1971); Howard v. Ingle, 180 So. 248 (La.App.2d Cir. 1938). See also Comment, 25 La.L. Rev. 108, 137-43 (1964). Similarly consistent with these holdings are the recent decisions in Swope v. Mitchell, 324 So.2d 461 (La.App.3d.Cir. 1975) and Berry v. Equitable Life Assurance Society, 316 So. 2d 399 (La.App.1st Cir. 1975).[4]
Effect of contractual designation of a beneficiary to the decedent's interest in their funds of the plans
Having amplified and reaffirmed the essential holding of our original opinion, we now approach a supplementary issue (to reconsider which, was the primary purpose of granting rehearing): What is the effect, if any, of the decedent's contractual designation of a beneficiary to the now-payable proceeds attributable to his account in the funds?
This contractual agreement, as we have held, cannot (in the absence of legislation so authorizing) prejudice the rights of forced heirs or the community ownership of spouses of the wage earner, essentially, because rights of forced heirship and of spouses in community acquisitions are fundamental concepts of our legal system.
In our original opinion, however, we went further: We held that the contractual designation of a beneficiary was a complete nullity which transferred no property interest to the beneficiary, because it did not meet the requirements of the civil code for a valid testamentary disposition nor for a valid donation inter vivos.
*854 Upon reconsideration, for reasons to be elaborated, we now conclude that, so long as the constractual devolution of the decedent's interest to the beneficiary does not infringe upon the legitime of a complaining forced heir nor upon the community ownership of a complaining spouse, no prohibition of law prevents the courts from recognizing the contractual rights of the beneficiary to the ownership of the proceeds (so acquired by reason of the contract between the deceased employee, his employer, and the respective plans). We are re-enforced in this conclusion by the legislative recognition of such a contractual right in two relatively recent legislative acts, La.R.S. 23:638 (as amended in 1966) and La.R.S. 47:2404 C (as amended in 1968 and 1972).
The first of these statutes, La.R.S. 23:638[5], was originally enacted in 1954. By amendments in 1960 and 1966, it was broadened. The effect of the statute is to permit a full discharge from any adverse claim to any employer or trustee who makes a payment or refund pursuant to a written retirement or employee benefit plan "unless, before such payment or refund is made, the employer [etc.] . . . has received . . . written notice by or on behalf of some other person that such other person claims to be entitled to such payment or refund * * *." (We note, however, that this legally protected right to pay the contractual beneficiary was not legislatively intended to permit the contractual beneficiary to receive the proceeds free and clear of adverse claims, such as by the forced heir or spouse in community.[6] Contrast this with La.R.S. 22:647'[7] which expressly recognizes the contractual right of the beneficiary or payee *855 of a life insurance policy to receive the proceeds as even against the estate, heirs, and legatees of the insured.)
By the second of these enactments, La. R.S. 47:2404 C[8], the legislature specifically exempted from the state inheritance tax any proceeds payable to a beneficiary by reason of "any retirement or pension plan, trust, system or policy", which latter terms are broadly defined by the act. Implicit, if not explicit, by this provision is legislative recognition of the concept that the contractual beneficiary acquires an ownership right to the proceeds by virtue of the contract, not by virtue of inheritance or gift. (However, as in the case of the first cited statute the statutory recognition of the contractual right so legislatively recognized does not exclude any duty the beneficiary may have to account to forced heirs if their rights of inheritance are infringed by the contract, nor to spouses if their community ownership is violated by the contractual designation of a beneficiary.)
This legislative recognition of the contractual right of the beneficiary to receive the proceedswithout an equivalent legislative recognition of his right to do so free of his duty to account to forced heirs for invasion of their legitime, or to spouses in community for the share of the funds attributable to the latters' ownership interest in thempresents questions not expressly provided for by statute, insofar as the interests of forced heirs and of spouses for community ownerships. As in other unprovided-for situations, Civil Code Article 21 enjoins the judiciary: "In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent." See (concerning another area of law) Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1968).
We thus hold, consistent with the views expressed in the earlier part of this opinion (reaffirming the rationale of our original opinion as to these issues), that, although the contractual beneficiary may receive in full ownership the share of the funds passing to him by virtue of the decedent's contractual designation of him as beneficiary, he does so with the obligation to account to any complaining forced heir or spouse in community if his receipt of proceeds violates either the former's legitime or the latter's community ownership rights (as set forth more fully in the earlier part of this opinion). Where, before the disbursement to the beneficiary, the payors (as here) have received written notice of opposing claims of the estate or of a surviving spouse, they may provoke a concursus in which the claims of the beneficiary, of the estate (in which claims of forced heirs may be adjudicated), and of the surviving spouse to the proceeds may be apportioned in accordance with the views above set forth.
We thus adopt a judicial resolution of the competing legal interests analogous to that developed by our state courts in resolving the somewhat similar issues arising in federal savings bond caseswhere likewise, by statute, a form of devolution of a property interest was recognized as valid, but was nevertheless subjected to the *856 judicial requirement of an accounting, where requested, to the claims of any forced heir whose legitime was thereby prejudiced or of any spouse whose community ownership interests was thereby violated. See: Winsberg v. Winsberg, 220 La. 398, 56 So.2d 730 (1952); Succession of Guerre, 197 So.2d 738 (La.App.4th Cir. 1967); Succession of Videau, 197 So.2d 655 (La. App.4th Cir. 1967); Comment, 25 La.L. Rev. 108, 108-19 (1964).
The claimants in the concursus
Upon the remand to the district court, the funds on deposit are to be apportioned, in accordance with the above principles, to: (a) T. W. Montgomery, III, the contractual beneficiary, receiving them as owner by virtue of the contract; less (b) funds due to the surviving (or second) spouse, Mrs. Goldie Greig Montgomery, arising out of her community ownership arising from contributions to the funds made during the existence of the second community; and also less (c) funds due, if any, to the other forced heir, the minor, Monty George Montgomery (cited through a curator ad hoc), if (and only to the extent that) his legitime has been invaded by the otherwise-valid contractual disposition of the funds to T. W. Montgomery, III. Since the decedent's estate is also a party to this proceeding, determination of the latter's claim, if any, may be accomplished on the remand of the present proceedings.
Mrs. Sybil Chauvin Montgomery, the decedent's divorced wife by his first marriage was also impleaded as a claimant to the fund.
Had she asserted any claim, her community ownership rights to share in the funds would be recognized on the basis of the contributions made to the funds during the existence of the first community. However, by answer to the petition, she specifically prays for recognition of the claim of the contractual beneficiary (T. W. Mont-gomery, III), her son; only in the alternative does she assert her own claim.
We have recognized the claim of the contractual beneficiary to receive the funds as owner by virtue of the contractual designation (less sums due to the surviving spouse of the second community; and to the other forced heir, the minor Monty George Montgomery, if the latter's legitime is invaded by the contractual disposition). Accordingly, Mrs. Sybil Chauvin Montgomery is dismissed from the concursus.

Decree
For the reasons assigned, therefore, we reverse the judgment of the district and intermediate courts recognizing T. W. Montgomery, III, as the full owner of the funds in dispute, and we remand this case to the district court for it to apportion the funds involved, in accordance with the principles set forth in this opinion, as between (a) the contractual beneficiary, (b) the surviving spouse in community, and (c) the minor forced heir (Monty George Montgomery) (ifand only to the extent thatthe latter's legitime has been invaded by the contractual devolution of the funds to the contractual beneficiary). All costs of these proceedings are to be taxed against the funds deposited into court. La. C.Civ.P. art. 4659.
The right of all parties to apply for further rehearing is expressly reserved. Rules of Supreme Court of Louisiana (1973), Rule 9, Section 5.
REVERSED AND REMANDED TO THE DISTRICT COURT.
SUMMERS, J., concurs and assigns reasons.
SANDERS, C.J., concurs in part and dissents in part and will assign written reasons.
SUMMERS, Justice (concurring).
Inasmuch as the ultimate result under this opinion on rehearing will be the same *857 as the result which would follow under the original opinion, I am concurring in this opinion on rehearing.
However, the opinion on rehearing erroneously holds that the beneficiary named in the plans receives the benefits in full ownership, the share of the funds passing to him by virtue of the decedent's contractual designation of him as beneficiary. Notwithstanding that the opinion on rehearing imposes upon the beneficiary the obligation to account to any complaining forced heir or spouse in community if his receipt of proceeds violates either the former's legitime or the latter's community ownership rights, the principles of forced heirship and community property are violated by vesting full ownership in the beneficiary.
The authority relied upon to bring about the vesting of full ownership in the beneficiary is Section 638A of Title 23 of the Revised Statutes. Under this enactment, whenever payment or refund is made to an employee or his beneficiary pursuant to a designation in a plan, such payment or refund shall discharge the employer and any trustee or insurance company making such payment or refund from all adverse claims thereto and from all liability for inheritance taxes due the State, provided the payment is made before the employer or former employer receives written notice on behalf of some other person of a claim or entitlement to the payment or refund.
This statute is designed solely and exclusively to protect employers and any trustee or insurance company making such payments from liabilitynothing more. It does not purport to endow the payments made with any other legality. Especially the statute does not say or infer that the payment vests the beneficiary receiving the payment with full ownership of the funds. Yet the majority so holds. This holding is doubly erroneous under the facts of this case because the statute provides that the protection of the employer, trustee or insurance company does not result where they have received written notice of a claim before the payment is made. In that event, which is the case here, the payment to the beneficiary is not authorized. That is to say, under these circumstances payment is to be made to the parties entitled to the funds in accordance with the law of forced heirship or community property as the case may be.
In substance, it is my view that the majority has improperly relied on Section 638A to circumventalbeit temporarily the law of forced heirship and community property; indeed, the law which pertains to the formalities for donations mortis causa also.
I subscribe to the opinion on rehearing, however, wherein it adopts and affirms the original opinion.
SANDERS, Chief Justice (concurring in part and dissenting in part).
I agree with the majority that the benefits of the profit-sharing and retirement plans are payable to the designated beneficiary.
I disagree, however, with the holding as to apportionment. As I pointed out in my dissent on original hearing, I would adhere to the principles announced in Succession of Rockvoan, La.App., 141 So.2d 438 (1962). In that case, the Court held that the benefits of such a plan were governed by life insurance principles.
The apportionment system announced in the majority opinion is both unsound and unworkable. It is based upon "the value of each contribution paid into the fund" for the employee's account.
In the retirement plan, separate employee accounts are not maintained. The employer's contributions are to the total pension fund, determined by actuarial calculations.
*858 No portion of the contribution is allocated to a specific employee.
Although Lynch v. Lawrence, La.App. 293 So.2d 598 (1974) is cited with approval, the "benefits earned" principle announced in that decision is not followed.
In the profit-sharing plan also, contributions are an unreliable basis for apportionment, since the holding does not take into account the provisions for "gradual vesting" stipulated in the plan.
In my opinion, the majority holding unnecessarily hampers the operation of employee-plans in Louisiana.
For the reasons assigned, I concur in part and dissent in part.
NOTES
[1] In a companion suit, Mrs. Goldie Greig Montgomery et al. v. T. W. Montgomery, III, the widow-administratrix, sought recovery from the defendant son, inter alia, of certain proceeds of an insurance policy (alternatively, of the value of community premiums paid for this term policy, which had no cash surrender value). For the reasons stated by our original opinion, we affirm the rejection in that suit of the widow-administratrix's demand upon the insurance policy claims.
[2] Although at the time of dissolution of the community, the right to share in the funds' proceeds may be a mere expectancy without marketable order or redeemable cash value, the wage earner and his spouse may at that time agree upon its value and partition it, along with the other assets of the community. In practice, usually this is done, after a separation or divorce, by the wage earner paying his spouse for the discounted value of her half of this community asset, either by cash or by the spouse receiving in exchange an agreed-upon equivalent share of the other community assets. See Comment, 25 La.L. Rev. 108, 140-41 (1964).

In the present case, however, the husband did not settle with his first wife for her interest in the contractual right to receive these proceeds eventually; and therefore, to the extent of the value of the contribution of the first community in these funds, the first community's interest remains an unpartitioned assets of that community. See Langlinais v. David, 289 So.2d 343 (La.App.3d Cir. 1974).
[3] Likewise inapplicable, and inappropriate to extend by analogy (since the subject of special legislation), are the decisions holding that teachers' retirement benefits are the separate property of the teacher rather than a community asset and are receivable by the contractual beneficiary, not the heir. Teachers' Retirement System v. Vial, 317 So.2d 179 (La.1975). See also 27 La.L.Rev. 457-58 (1967).
[4] Succession of Mendoza, 288 So.2d 673 (La. App.4th Cir. 1974) and Succession of Rockvoan, 141 So.2d 438 (La.App.4th Cir. 1962) analogized such funds to life insurance contracts, and these decisions permitted the contractual beneficiary to receive the proceeds, free and clear of the rights of forced heirs and of the communities during which an interest was acquired. As Professor Pascal pointed out, 35 La.L.Rev. 309 (1974), this result is not authorized by legislation and violates fundamental concepts of community property. These decisions are overruled, insofar as inconsistent with the views expressed by this opinion.
[5] La.R.S. 23:638, subd. A, as amended, now provides in full:

"Whenever payment or refund is made to any employee, former employee or his beneficiary or estate pursuant to a written retirement, death or other employee benefit plan or savings plan, such payment or refund shall fully discharge the employer and any trustee or insurance company making such payment or refund from all adverse claims thereto and from all liability for inheritance taxes due the state, unless, before such payment or refund is made, the employer or former employer, where the payment is made by the employer or former employer, has received at its principal place of business within this state, written notice by or on behalf of some other person that such other person claims to be entitled to such payment or refund or some part thereof or where a trustee or insurance company is making the payment, such notice has been delivered by the employer to the home office of such trustee or such insurance company or has otherwise been received by said parties. In the event the employee is deceased and a judgment of possession has been entered in his or her succession, payment of such money, or portions thereof, pursuant to the terms of the judgment of possession shall likewise fully protect the employer and any trustee or insurance company making such payment unless before such payment is made written notice of an adverse claim is received as provided herein."
[6] We are reinforced in this view by Sub-Section B of La.R.S. 23:638, which specifically provides that the payment by the employer, etc., shall not affect the inheritance tax liability "as between all persons" other than the employer, etc.

The provision in full provides: "B. Nothing contained in this Section shall affect any claim or right or inheritance tax to or on any such payment or refund or part thereof as between all persons other than the employer and the trustee or insurance company making such payment or refund."
[7] La.R.S. 22:647 provides, insofar as pertinent:

"A. The lawful beneficiary, assignee, or payee, including the insured's estate, of a life insurance policy or endowment policy, heretofore or hereafter effected shall be entitled to the proceeds and avails of the policy against the creditors and representatives of the insured and of the person effecting the policy or the estate of either, and against the heirs and legatees of either such person, and such proceeds and avails shall also be exempt from all liability for any debt of such beneficiary, payee, or assignee or estate, existing at the time the proceeds or avails are made available for his own use.
"B. The lawful beneficiary, assignee, or payee, including the annuitant's estate, of an annuity contract, heretofore or hereafter effected, shall be entitled to the proceeds and avails of the contract against the creditors and representatives of the annuitant or the person effecting the contract, or the estate of either, and against the heirs and legatees of either such person, saving the rights of forced heirs, and such proceeds and avails shall also be exempt from all liability for any debt of such beneficiary, payee, or assignee or estate, existing at the time the proceeds or avails are made available for his own use. * * *"
[8] La.R.S. 47:2404 C provides in full:

"Notwithstanding the provisions of this section or of any provision of law, there shall be excluded from the property subject to the tax imposed in this part any proceeds receivable by any beneficiary, other than the estate of the decedent, under any life insurance policy, or any retirement or pension plan, trust, system or policy. Retirement or pension plan, trust, system or policy, as used in this subsection, means and includes any contract, agreement or arrangement under which an annuity or other payment was payable to the decedent or which the decedent possessed the right to receive, either alone or in conjunction with another, for his life."