UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA LOCAL 198 AFL–CIO PENSION PLAN, Harry Lee Smith, Jr., R. F. Turner, Sid Blanchard, E. C. Frederick, Anthony Moore, Jr., Haskel N. Douglas, Wendell B. Moore, Robert McGlothlin, Henry Holden and Davis Rayborn, Jr., Trustees,

v.

Mrs. Margaret MYERS, Mrs. Opal Myers, Donald J. Myers and Katie Jean Myers.

Civ. A. No. 77–436–B.

United States District Court, M. D. Louisiana.

March 31, 1980.

Marie Healey, Dodd, Barker, Boudreaux, Lamy & Gardner, New Orleans, La., for plaintiff.

W. Michael Stemmans, Nicholson & Stemmans, Baton Rouge, La., for defendant, Mrs. Margaret Myers.

Joseph A. Gladney, Baton Route, La., for defendant, Mrs. Opal Myers.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

This case involves a dispute over the proceeds of a pension plan. The parties have submitted the case for decision on cross motions for summary judgment, having agreed upon and filed a joint stipulation of facts.

### I.

#### *Factual Background*

The United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 198 AFL–CIO Pension Plan (Pension Plan) and the trustees thereof, filed this suit seeking a declaratory judgment that the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.*, requires the preemption of Louisiana's community property laws. This litigation resembles an interpleader action since the plaintiffs claim no right to the benefits and the actual dispute is among the defendants.

Jurisdiction in this Court exists under 29 U.S.C. § 1132(a)(3). The trustees-plaintiffs herein are fiduciaries under 29 U.S.C. § 1002(21) and therefore entitled to bring this action to enforce the provisions of the plan.

On September 1, 1963, pursuant to collective bargaining, certain employers and Pipefitters Local 198 put into effect the Pension Plan at issue. The Plan is a defined benefit plan within the meaning of the statute, in that it stipulates the benefit each covered employee is to receive based

upon years of "service credits," but there is no separate delineation of funds for the account of any individual employee. All contributions are made by employers and the amount of the employer contribution per work hour is bargained for and set out in successive contracts between Local 198 and the employers.

Benefits for death, disability or retirement are fixed in the Plan according to total "service credits" and benefits may be changed from time to time. Participants accumulate "past service credits" and "future service credits." "Past service credits" are those accumulated by the employee in the industry prior to the establishment of the Plan on September 1, 1963. No contributions are made to the fund on behalf of or by the covered employee for past service credits. "Future service credits" are those accumulated subsequent to the Plan's establishment and are based on the number of hours worked by the employee in covered employment during a given year. As stated, only the employer pays contributions and these are paid only on "future service credits"; no submissions of any kind are required to be made by a covered employee himself. Different monthly amounts are required to be paid for past service credits and for future service credits. Pension benefits are paid in the form of a monthly annuity for the life of a covered employee, and, since 1978, where a joint and survivor election has been made, also for the life of the surviving spouse.

The deceased, Edward J. Myers, elected early retirement and retired on February 1, 1973. At that time the Plan provided that upon retirement each covered employee automatically received joint and survivor coverage if, upon the date of his retirement, he was legally married and his spouse survived him. Under the joint and survivor provision, half of the pensioner's annuity was payable, upon his death, to his surviving spouse until such time as the death of the spouse. The primary benefit amount, however, was the same whether or not the covered employee elected joint and survivor coverage. Since the adoption of the federal statute, the Plan provisions were amended in 1978 so as to provide for employee election of joint and survivor coverage rather than automatic coverage.

Myers accumulated 15.00 years of "past service credits" and 7.90 years of "future service credits," and, since he retired prior to the normal age of sixty-five, his monthly annuity was reduced by 17.5 percent, according to the Plan's provisions. His monthly annuity was calculated by the Plan as follows:

| | |
|---|---:|
| 15 years at $10.50 (past service) | $157.50 |
| 7.9 years at $12.50 (future service) | 98.75 |
| | $256.25 |
| Less 17.5% for early retirement | 44.84 |
| Total | $211.41 |

Commencing in February, 1973, Myers began to receive a monthly annuity of $211.41. He died on August 3, 1976, and at that time his pension was $256.39 as a result of various increases in payment benefits made in accordance with the Plan provisions. Upon the death of Myers, the Plan commenced payment of a monthly annuity to his surviving legal spouse, Margaret Juanita Myers. This annuity amounts to $128.19 and is the subject of this controversy.

An application for joint and survivor benefits was made to the fund by Mrs. Opal Myers, a former spouse of the deceased, and that application precipitated this litigation. The two claimants are Mrs. Margaret Myers, the surviving spouse of decedent, and Mrs. Opal Myers, a former spouse of decedent. The other two named defendants, Donald J. Myers and Katie Jean Myers, are the children of Edward and Opal Myers. They have not made any appearance in this lawsuit and they have not asserted any claim upon the pension benefits or made any demand upon the Fund.

A resume of the marital history of Edward J. Myers will be helpful in understanding the issues. He and each wife lived in Louisiana throughout each marriage. On October 5, 1936, Myers and Opal Myers were married. They were separated by judgment dated March 19, 1954, under suit filed February 19, 1954, and a final judgment of divorce was entered March 3, 1961.

On March 11, 1961, Margaret Juanita Myers and Edward Myers were married in Mexico. By judgment dated May 27, 1963, they were separated, under suit filed March 25, 1963. This marriage ended on October 18, 1968, by a judgment of divorce.

On December 20, 1968, Edward Myers married Lucille E. Estes. This union lasted until May 12, 1970, when the couple was divorced. (This former spouse has made no appearance in this action.)

On October 2, 1972, Edward Myers remarried Margaret Juanita Myers in Texas, although they resided in Louisiana. At the time of his retirement in 1973 and at his death in 1976, Edward Myers and Margaret Myers were living together as husband and wife.

The claim of Mrs. Margaret Myers arises from her status as the surviving widow. As previously noted, under the provisions of the Pension Plan, she is the only person entitled to receive survivor's benefits and they are payable for her lifetime. Mrs. Opal Myers claims a community property interest in the benefits on the notion that, because the employee received prior service credits at the time he retired, a proportional amount belongs to the community of acquets and gains which had existed between them from October 5, 1936, until February 19, 1954.

The Pension Plan makes no provision for community property rights. The Trustees allege that application of Louisiana's community property laws will render the Plan actuarily unsound and thus violate the federal scheme. They also urge that the enforcement of state law will be in contravention of the anti-assignment provision, 29 U.S.C. § 1056 and that the state law is preempted by 29 U.S.C. § 1144.

## II.

### Preemption

We start with the proposition that the delicate relationships of husband-wife, parent-child and family-property arrangements are traditionally matters of exclusive state concern. No provision of Article I of the Constitution confers power upon the Congress to legislate in these sensitive state fields. Any general federal law attempting to regulate such relationships would be constitutionally infirm. If the Tenth Amendment reserved any powers to the states, it must be the power to legislate the rules applicable to marriage, separation and divorce, community property and succession.

The Supremacy Clause, however, mandates that any federal law made pursuant to the Constitution prevails over any state constitution or law to the contrary. Clearly then, when the Congress exercises the legislative powers vested in it by the Constitution, it may prescribe the rules which will apply. For example, no state can subject federal property to its laws absent congressional consent.

Here the Congress has, under its Commerce Clause powers, legislated in the field of employee retirement benefit plans, an area which has been rife with mismanagement, bankrupt plans and, indeed, outright fraud and corruption, according to congressional findings.

We must now determine whether the Congress, in prescribing stringent management, reporting and actuarial requirements for private contractual employee retirement plans intended, under the Supremacy Clause, to supersede Louisiana's community property laws.

The Pension Plan and the surviving spouse rely upon 29 U.S.C. § 1144 as evidencing congressional intent to preempt all state laws regarding employee benefit plans, including state property laws regarding ownership interests. That section provides:

"§ 1144. Other laws

"(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title."

Subsection (b) has no application here; that provision excepts state criminal laws and laws dealing with insurance, banking and securities from subsection (a).

The key word in the statute is "relate." Do the community property laws of Louisiana relate to employee benefit plans within the meaning of Section 1144?

There are well established standards to be applied in considering the question of preemption of state law by federal legislation.

Supreme Court decisions establish that only where a specific compelling and clear federal interest so requires will state domestic relations laws be preempted by federal legislation. *McCune v. Essig,* 199 U.S. 382, 26 S.Ct. 78, 50 L.Ed. 237 (1905), involved a dispute over the issuance of a land patent between a widow and the daughter of her deceased husband. The issue before the Court was whether to apply the inheritance laws of Washington or the federal homestead law. Since the title to the land belonged to the United States prior to the issuance of the patent, and the rights of either or both parties arose from the laws of the United States, the Court held that the federal homestead act preempted the state law. Clearly, the Congress has the power under the Constitution to declare the rules applicable to acquiring title to land owned by the United States.

*Wissner v. Wissner,* 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950), was a case involving the proceeds of a National Service Life Insurance policy issued under the act setting up life insurance for members of the armed forces during World War II. The deceased serviceman had named his mother as beneficiary of the policy while the premiums were paid out of community property. The widow sued the mother for one-half of the proceeds, alleging them to be community property. The Supreme Court held that the policy benefits were not subject to California's community property laws. The Court reasoned that this was a life insurance program set up by the Congress which required uniformity and that the United States itself managed the program and paid out the liabilities and costs of the insurance. Since the Act allowed the insured to select a beneficiary, this congressional mandate preempted state community property laws. The paramount interest and authority of the Congress in the armed forces is apparent.

Texas inheritance laws versus survivor's rights in United States Savings Bonds was the issue before the Court in *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). Mrs. Free purchased bonds which were issued to "Mr. *or* Mrs. Free." Under federal Treasury regulations, if either party dies, the survivor becomes the "sole and absolute owner" of the bonds. Upon the death of Mrs. Free, her son claimed an interest in the bonds, as her heir at law. The Court held that the savings bonds belonged entirely to the surviving husband and that the Texas law was superseded. The crux of this decision was the finding of a direct conflict between the state and federal laws and the right of the federal government to make federal savings bonds as attractive as possible by allowing owners to avoid inheritance proceedings.

*Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979), involved a dispute as to the status of benefits due the husband under the Railroad Retirement Act of 1974, 45 U.S.C. § 231, *et seq.* The divorced wife claimed that the benefits were community property in accordance with state law and that therefore she was entitled to her one-half. The Supreme Court reversed the California Supreme Court and held that the wife had no property interest in the proceeds due to the preemption of the state law by the federal legislation. The Court held that the Railroad Retirement Act is a benefit plan established by Congress; it is supported by general federal taxes, not only the taxes paid by the railroad employees and carriers; it resembles Social Security in that it is not contractual and Congress may change or eliminate benefits at any time. The Congress, the Court said, has the power to determine the character of a federally created benefit, state laws notwithstanding.

In the case before this Court, the benefits which are at issue are the benefits of a private pension plan and this is significant. There is no federally created entitlement. The federal government did not establish the Pension Plan and it does not fund its day-to-day operations or management. The Pension Act does not control the amount of money an employee receives or how much money an employer must contribute; it does not regulate who is a participant or a beneficiary. All of this is determined through negotiations between the employers and the Union. The Pension Plan is not identical to all other employee benefit plans and the Act does not demand uniformity of benefits. Legislative history indicates that its purpose is to ensure fiscal responsibility and fiduciary management, not to dictate details of ownership interests.

In *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), the Court recognized application of the Texas law of coverture to a note in favor of a married woman and against the Small Business Administration. The Court refused to preempt state law and said:

"Again, it must be emphasized that this was a custom-made, hand-tailored, specifically negotiated transaction. It was not a nationwide act of the Federal Government, emanating in a single form from a single source." (86 S.Ct. at 504)

In *Rice v. Santa Fe Elevator Corporation*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), the Supreme Court held:

"Congress legislated here in a field which the States have traditionally occupied. So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (67 S.Ct. at 1152—Citations omitted)

This approach has been consistently followed. In *Hisquierdo v. Hisquierdo, supra,* the Court again affirmed this tenet:

"On the rare occasion when state family law has come into conflict with a federal statute, this Court has limited review under the Supremacy Clause to a deter-mination whether Congress has 'positively required by direct enactment' that state law be pre-empted. A mere conflict in words is not sufficient. State family and family-property law must do 'major damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that state law be overridden." (99 S.Ct. at 808—Citations omitted)

■ The language of 29 U.S.C. § 1144, quoted above, does not specifically demand preemption of Louisiana's community property laws. Preemption may be compelled, however, even if the wording of the statute is not specific where the state law conflicts with congressional objectives to such an extent that it must be assumed that Congress intended to preempt state law. *Rice v. Santa Fe Elevator Corporation, supra* 67 S.Ct. at 1152. The Court then must ascertain congressional objectives in enacting this legislation.

■ The unmistakable purpose of the Act was to protect union workers from mismanagement and corruptive practices of those people selected to oversee their pension plans. The statute is also designed to ensure that legitimate expectations of workers in receiving retirement benefits actually materialize. We turn to the statute itself.

29 U.S.C. § 1001, *et seq.*, provides very comprehensive regulations governing the establishment, operation and maintenance of employee benefit plans. Section 1001 contains congressional findings and declaration of policy. That section, after noting the impact upon interstate commerce of employee benefit plans, the preferred federal tax treatment of such plans and proliferation of such plans, declares, in part:

". . . [T]hat despite the enormous growth in such plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans; that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to

adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable . . . that minimum standards be provided assuring the equitable character of such plans and their financial soundness."

The congressional declarations continue that it is the policy of the Act to protect interstate commerce in the interest of participants and their beneficiaries, "by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions and ready access to the Federal Courts."

Finally, the Congress declares that it is the policy of the Act to protect, "the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance."

The substantive provisions of the statute carry out the congressional findings and declaration of policy in detail: Part 1 regulates reporting and disclosure, Part 2 provides for participation and vesting of benefits, Part 3 provides minimum funding standards, Part 4 establishes fiduciary responsibility and defines prohibited transactions, and Part 5 provides for administration and enforcement. Of course, it was necessary to provide for a bureaucracy to administer the provisions of the Act and subchapter II provides for a joint pension task force to police the private pension provisions.

The legislative history of the Act very clearly sets forth the congressional intent as is shown in the following quotations:

"The Employee Benefit Security Act is designed (1) to establish minimum standards of fiduciary conduct for Trustees, Administrators and others dealing with retirement plans, to provide for their enforcement through civil and criminal sanctions, to require adequate public disclosure of the plan's administrative and financial affairs, and (2) to improve the equitable character and soundness of private pension plans by requiring them to: (a) vest the accrued benefits of employees with significant periods of service with an employer, (b) meet minimum standards of funding and (c) guarantee the adequacy of the plan's assets against the risk of plan termination prior to completion of the normal funding cycle by insuring the unfunded portion of the benefits promised." (1974 U.S.Code Congressional and Administrative News, pp. 4639, 4655, Employee Retirement Income Security Act of 1974 Legislative History, P.L. 93–406)

"One of the most important matters of public policy facing the nation today is how to assure that individuals who have spent their careers in useful and socially productive work will have adequate incomes to meet their needs when they retire. This legislation is concerned with improving the fairness and effectiveness of qualified retirement plans in their vital role of providing retirement income. In broad outline, the objective is to increase the number of individuals participating in employer-financed plans; to make sure to the greatest extent possible that those who do participate in such plans actually receive benefits and do not lose their benefits as a result of unduly restrictive forfeiture provisions or failure of the pension plan to accumulate and retain sufficient funds to meet its obligations . . . ." (1974 U.S.Code Congressional and Administrative News, p. 4676)

"The policy statement in Section 2 is most significant in that it recognizes that all of the problems in the private pension field surfaced by the Committee are so interrelated that they cannot be resolved without a comprehensive legislative program, dealing not only with malfeasance

and maladministration in the plan, or the consequences of lack of adequate vesting, but also with the broad spectrum of questions such as adequacy of funding, plant shut-downs and plan terminations, transferability of vested credits, adequate communication to participants, and, in short, the establishment of certain minimum standards to which all private pension plans must conform if the private pension promise is to become a reality rather than an illusion." (1974 U.S.Code Congressional and Administrative News, p. 4851)

The congressional declarations of policy, the legislative history and the provisions of the law itself reveal that Congress was concerned about fiduciary standards, openness and soundness of plan, not the vagaries of husband-and-wife property law enacted by the states. Those aims of the Congress would not be thwarted by allowing a former spouse to assert her community interest in a retirement fund. In fact, the policy of the marital regimes laws is in harmony with the general objectives of the Act. The Pension Plan statute supersedes only those state laws that "relate to any employee benefit plan."

The statute deals with subjects which are not related to the policies underlying community property laws. The federal legislation concerns itself with the overall management and fiscal aspects of pension plans, including vesting qualifications, fiduciary obligations of trustees, adequate disclosures to beneficiaries and the soundness of these plans. The legislative history does not indicate any concern with problems associated with a former spouse's interest in benefit plans, and the Act is generally unconcerned with the use of benefits by participants; the objective is that benefits are to be actually paid as promised.

The property relationship between husband and wife, as all aspects of family law, remains an area traditionally left to definition, regulation and control by the states.

Louisiana's community property laws are deeply embedded in Louisiana's history, antedating its admission to the Union in 1812 and the Louisiana Purchase and, indeed antedating the United States of America.[1]

Although the Supreme Court has not considered the application of this statute to state community property laws, there is jurisprudence from lower federal courts.

In *Stone v. Stone*, 450 F.Supp. 919 (N.D. Cal.1978), the Court held that this Act does not preempt California's community property laws and made the following comment, which I endorse:

"Courts try to give federal statutes interpretations consistent with state domestic relations policy. Because Congress generally drafts statutes in a way that avoids conflict with state domestic relations law, courts interpret them with the presumption that Congress did not intend to interfere with the operation of that body of state law. Both Congress and the courts recognize that ' " 'the whole subject of domestic relations of husband and wife, parent and child, belongs to the laws of the states and not to the laws of the United States.' " ' Congress does not infringe *sub silentio* 'the power to make rules to establish, protect, and strengthen family life [which] is committed by the Constitution of the United States * * to the legislature of [each state].' " (450 F.Supp. at 924—Citations omitted)

In *Hewlett-Packard Co. v. Barnes*, 425 F.Supp. 1294 (N.D.Cal.1977), on the other hand, the Court held that California's Health Care Service Plan Act of 1975 was preempted by the Act. That state law attempted to provide low cost health care to California residents by regulating employers' health care service plans. The state law governed funding, disclosures, licensing and the soundness of these health plans. There were obvious and specific overlaps and inconsistent provisions between the state and federal laws relating to details of

---

1. Louisiana has recently amended its community property laws so as to abandon the "head and master" concept and to substitute equal property management by spouses. See Act 709 of 1979.

the benefit plans. The Court held that the state law was superseded because it "relates to" employee benefit plans.

Hawaii's Prepaid Health Care Act was preempted by the federal law in *Standard Oil Company of California v. Agsalud,* 442 F.Supp. 695 (N.D.Cal.1977), because it had an immediate impact on pension plans. The California and Hawaii acts "related to employee benefit plans" within the meaning of Section 1144. State requirements could and did conflict with federal requirements and could have interfered with the federal scheme and infringed upon the federal standards and guidelines in pension plan control.

*Pervel Industries, Inc. v. State of Connecticut Commission on Human Rights and Opportunities,* 468 F.Supp. 490 (D.Conn. 1978), dealt with state discrimination statutes and the federal employee benefits law. There, the Court held that Connecticut's antidiscrimination statute was superseded by the federal statutes insofar as they applied to employee benefit plans. The Court found Connecticut's antidiscrimination law legislated specifically on the subject of disability benefits and related to an employee benefit plan.

*Francis v. United Technologies Corporation,* 458 F.Supp. 84 (N.D.Cal.1978), held that California's community property laws were superseded by the federal Act, giving a very strict reading to Sections 1144 and 1056:

> "This language was intended to effect the broadest possible preemption of state law. The inclusion of all state laws which 'relate to' any E.R.I.S.A. plan was an attempt to make this preemption cover laws which were not specifically directed at this subject area, but which still affected it. . . . The effect of California's community property law would be to alienate one-half of benefits, in clear violation of this section of the Act. To that extent the community property laws are preempted." (458 F.Supp. at 86)

I disagree with the conclusion in that case and concur in the reasoning of *Stone v. Stone, supra,* and other cases, such as *Cate v. Blue Cross and Blue Shield of Alabama,* 434 F.Supp. 1187 (E.D.Tenn.1977), and *In re Marriage of Pardee,* 408 F.Supp. 666 (C.D. Cal.1976).

The Supreme Court has repeatedly held that state domestic relations laws are not to be preempted unless Congress has clearly declared its intention. This Court does not find the requisite congressional intent in the retirement benefits Act. The language of the statute is unclear in dealing with state laws that only peripherally touch employee benefit plans. The legislative history shows the congressional desire to broadly preempt state law, but only those laws that "relate to employee benefit plans." Extended to logical conclusion, all state laws on community property, marriage, divorce, alimony, child support, successions and even ownership of property could arguably "relate to" an employee benefit plan.

The Act is concerned not so much with what the beneficiary does with his pension checks or how they are spent but with whether those in charge actually deliver the benefits. The federal law was designed to protect these employees from outsiders, it does not purport to change the relationship between husband and wife or parent and child.

■ This federal law does not preempt the laws of Louisiana on community property. We note that the Supreme Court recently dismissed the appeal and denied certiorari in a California state court case holding that benefits must be paid by the trustees in accordance with state community property law. See *Johns v. Retirement Fund Trust, Etc.,* 85 Cal.App.3d 511, 149 Cal.Rptr. 551 (1978), cert. denied, 444 U.S. 818, 100 S.Ct. 38, 62 L.Ed.2d 26 (1980). While we must not read too much into such a denial, the action of the Court at least does not undermine the conclusion reached here.

III.

*Alienation and Assignment*

29 U.S.C. § 1056(d) provides:

"Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."

The Trustees argue that division of pension benefits along community property lines is a prohibited assignment or alienation in violation of Section 1056.

A state's classification of community interests as an ownership interest is not dispositive of this issue; this is an interpretation of federal law and unaffected by state determination. Nevertheless, marital rights are different from business rights or business creditors, and members of the employee's family are surely included within the class that Congress intended to protect. Declaration of policy, 29 U.S.C. § 1001, quoted *supra; Stone v. Stone, supra.*

Federal courts have held that support and alimony orders are not included within the prohibition of Section 1056. (See *American Telephone and Telegraph Company v. Merry,* 592 F.2d 118 [2d Cir. 1979], and *Cody v. Riecker,* 594 F.2d 314 [2d Cir. 1979].) Community property rights acquired by operation of state law are no more "alienation or assignments" than are such state court orders which also arise by operation of state family law. Section 1056(d) prohibits business assignments, not property interests regulated by state family law.

As with Section 1144 and preemption, no clear congressional intention to thwart community property rights by Section 1056 is shown. The words "assign" and "alienate" do not normally imply community property interests and the legislative history is again negative. The only interpretation of Section 1056 which harmonizes state-federal relations is that Congress intended to protect workers from third parties, such as creditors, to help guarantee that benefits would be available for the workers and their dependents, when needed. It is entirely likely that participants in such plans in community property states have anticipated community interests in accordance with state law and have assumed that the rights of the spouse would be protected. We may conclude that Congress also made such an assumption without in any manner doing violence to the federal program or congressional intent.

There is no community property settlement agreement here. Without considering the effect upon such contracts, the Court holds that acquisition of an interest in benefits by operation of state community property law is not an assignment or alienation prohibited by 29 U.S.C. § 1056.

Finally, Mrs. Opal Myers argues convincingly that, if under Louisiana law she acquired a property interest in her spouse's benefits by virtue of the existence of the community from 1936 to 1954, then a federal statute adopted in 1975 cannot constitutionally deprive her of previously acquired property. She argues that such a statute would amount to a confiscation of private property prohibited by the Constitution. Our conclusion that Congress did not intend preemption of state community property laws here permits avoidance of this serious constitutional issue.

### IV.

*Louisiana Community Property Law*

Myers retired on February 1, 1973, and at that time he was credited with "past service" of fifteen years (August 18, 1947, to September 1, 1963). It will be recalled that the Plan was established on September 1, 1963. The community of property between Myers and Mrs. Opal Myers was terminated on February 19, 1954, some eight and a half years prior to the establishment of the retirement plan. Myers was married to Mrs. Margaret Myers at the time the Plan was established, at the time of his retirement and at the time of his death.[2]

In view of the fact that the Plan was not in existence at the time of the dissolution of the community between Myers and his first wife, it is obvious that there was no settlement between them of any community interest which she might have had in the

2. There was, as noted above, an intervening divorce, marriage and divorce, and remarriage to Mrs. Margaret Myers, but that former spouse has made no claim in these proceedings.

benefits. A determination of her interest is dependent upon Louisiana law and specifically the provisions of the Louisiana Revised Civil Code relating to community property.

Article 2399 provides:

"Every marriage contracted in this State, superinduces of right partnership or community of acquets or gains, if there be no stipulation to the contrary." [3]

Article 2400 provides:

"All property acquired in this State by non-resident married persons, whether the title thereto be in the name of either the husband or wife, or in their joint names, shall be subject to the same provisions of law which regulate the community of acquets and gains between citizens of this State."

Article 2402, in part, provides:

"This partnership or community consists of the profits of all the effects of which the husband has the administration and enjoyment, either of right or in fact, of the produce of the reciprocal industry and labor of both husband and wife, and of the estate which they may acquire during the marriage, either by donations made jointly to them both, or by purchase, or in any other similar way, even although the purchase be only in the name of one of the two and not of both, because in that case the period of time when the purchase is made is alone attended to, and not the person who made the purchase. . . ."

Article 2334 provides:

"The property of married persons is divided into separate and community property.

Separate property is that which either party brings into the marriage, or acquires during the marriage with separate funds, or by inheritance, or by donation made to him or her particularly.

The earnings of the wife when living separate and apart from her husband al-though not separated by judgment of court, her earnings when carrying on a business, trade, occupation or industry separate from her husband, actions for damages resulting from offenses and quasi offenses and the property purchased with all funds thus derived, are her separate property.

Actions for damages resulting from offenses and quasi offenses suffered by the husband, living separate and apart from his wife, by reason of fault on her part, sufficient for separation or divorce shall be his separate property.

Common property is that which is acquired by the husband and wife during marriage, in any manner different from that above declared. But when the title to community property stands in the name of the wife, it cannot be mortgaged or sold by the husband without her written authority or consent."

The claim of Mrs. Opal Myers is based upon the decision of the Louisiana Supreme Court in *T. L. James and Company, Inc. v. Montgomery*, 332 So.2d 834 (La.1976). In that case the Court considered a company pension and profit-sharing plan as affected by Louisiana community property law.

There, the employee was married in 1935, employed by the company in 1946 and became a participant in the plans in about 1950. The employee and his first wife were divorced in 1958, and no mention of the future rights under the company pension plan was made in the community property settlement agreement. In 1958 the employee entered a second marriage which was still in existence at his death. The plan there involved was funded entirely by employer contributions and benefits under both retirement and profit-sharing vested only at death, retirement or resignation from the company. The plan permitted a designation of beneficiary, and the employee in this case had designated his son from his first marriage as beneficiary. The

3. Louisianians have always had the right to stipulate a marital regime different from community property prior to marriage. Recent amendments permit such contractual arrange-ments between husband and wife even after marriage. See La. Civil Code, Arts. 2328 and 2329, as amended by Act 709 of 1979.

Court held that the designation by the employee of a beneficiary cannot, under Louisiana law, prejudice the rights of a forced heir or of community ownership of the spouses and specifically held that no plan or device between the employer and employee can have the effect of nullifying the rights of a wife.

The Louisiana Supreme Court took the position that employer contributions are not gratuitous, that they are, in effect, deferred compensation; and, although there is no present right to claim them, when such contributions are made during the existence of the community, a property right to share in the ultimate proceeds thereby acquired by the employee is "acquired during the marriage" within the meaning of Articles 2402 and 2334, quoted above. The Court then attributed rights in the two communities according to the number of years of contributions which were made to the plan during the existence of the respective communities.

The entire predicate for the holding in *T. L. James and Company, Inc. v. Montgomery* is that the right to ultimately participate in an employee benefits plan is a property right, and, if that right stems from the earnings of the spouse, either by contributions made from his wages or contributions made on his behalf by his employer, that right belongs to the community if acquired during the existence of the community. Montgomery participated in the company plan for a period of some eight years during the existence of the community with his first wife, and a proportion of the rights acquired during that time belonged to that community.

The Supreme Court of Louisiana emphasized repeatedly that the husband's expectation of future benefits, although not yet vested, was acquired during the marriage. In the language of Article 2334:

"Common property is that which is *acquired* by the husband and wife *during [the] marriage* . . . ." (Emphasis supplied)

The Court specifically held:

"Each contribution of the employer to the fund entitles the employee or his beneficiary to share subsequently in the funds' proceeds; when made during the community, the property right to share ultimately in the proceeds thereby acquired by the wage earner, is '*acquire[d]* during the marriage' . . . . and is thus a community asset. . . ." (332 So.2d at 851)

In each Louisiana case which we have found dealing with this question, the employee benefit plan in question was established *during the marriage*. In this case, the employee benefit plan involved was established some eight and a half years subsequent to the dissolution of the community between Myers and Mrs. Opal Myers.

In *Sims v. Sims*, 358 So.2d 919 (La.1978), the Louisiana Supreme Court elaborated upon its decision in *T. L. James* confirming that the key issue is whether the right to future benefits was "acquired during the marriage." That case involved federal retirement rights under 5 U.S.C. § 8331, *et seq.*, which are entirely controlled by federal law and are funded in large measure by federal appropriations. The decision of the Supreme Court of the United States in *Hisquierdo v. Hisquierdo, supra,* casts grave doubt upon the viability of *Sims v. Sims. Hisquierdo* clearly indicates that where the federal government controls, operates, and funds the program involved, federal, not state law, will prevail. The point to be made here, however, is that in *Sims* the benefit plan involved was created during the existence of the first marriage, and the first community was entitled to recognition for a proportionate share predicated upon the contributions made during the existence of the community.

In this case, since the Plan did not come into existence until after the first community was already dissolved, any right to future expectation of benefits was not "acquired during the marriage." It is correct that, upon the establishment of the Plan, Myers was given "past service credits"

which included a portion of the time the first community did exist. Myers' right to participate in the employee benefit plan was acquired beginning September 1, 1963; it did not exist before that date. Consequently, it is impossible for this right to have been acquired during the existence of the community between Myers and Mrs. Opal Myers.

■ I hold that a Louisiana Court would not consider these benefits to be a community asset under Louisiana law and that Mrs. Opal Myers has no ownership interest therein.

### V.

### *Attorney's Fees*

Mrs. Margaret Myers has asserted a claim for attorney's fees in this action. The basis for that claim is 29 U.S.C. § 1132(g), which provides:

> "In any action under this subchapter by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

■ Since the language of the statute makes it discretionary with the Court, the Court exercises its discretion and will not award attorney's fees in this action. The issues involved are of recent origin, certainly are not free of doubt and are quite complex. The action of the Pension Plan in precipitating the action was necessary and entirely reasonable. The action of Mrs. Opal Myers in asserting that claim under the authority of *T. L. James and Company, Inc. v. Montgomery* was also reasonable under the circumstances. These issues could only be resolved by judicial intervention, and the Court is of the opinion that the cause of justice would be better served if each party paid his own attorney's fees.

Judgment will be rendered accordingly; counsel for plaintiff, the Pension Plan, is to prepare a form of judgment and submit it to the Court after approval as to form by all opposing counsel.