# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-334


PAIGE B. SULLIVAN

VERSUS

CHARLES P. SULLIVAN


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 88-850
HONORABLE BILLY HOWARD EZELL, DISTRICT JUDGE

**********

## BILLIE COLOMBARO WOODARD
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billie Colombaro Woodard, and Oswald A. Decuir, Judges.

**AFFIRMED.**

**Thibodeaux, C.J., dissents and assigns written reasons.**

> Jack W. Caskey
> Post Office Box 1052
> Lake Charles, Louisiana 70602
> Telephone: (337) 439-8854
> COUNSEL FOR:
>      Plaintiff/Appellee - Paige B. Sullivan

> James E. Hopkins
> Post Office Box 205
> Sulphur, Louisiana 70664
> Telephone: (337) 527-7071
> COUNSEL FOR:
>      Defendant/Appellant - Charles P. Sullivan

WOODARD, Judge.

In this community property case, the dispute involves the valuation of retirement funds in the former husband's Deferred Retirement Option Plan (DROP) account, which he rolled over into a Merrill Lynch IRA account without giving his former wife her interest in those funds. She repeatedly attempted to collect her share of the funds, during which time they greatly diminished in value. The husband appeals the trial court's judgment, which valued the funds as of the date he withdrew them from the DROP account and which awarded interest from the date his wife filed a request to establish her share of the funds. Finding no error in the trial court's judgment, we affirm.

* * * * *

Mr. Charles Sullivan and Mrs. Paige Sullivan married in 1964, divorced in 1988, and partitioned their community property in 1990. The partition judgment, *inter alia*, ordered that each party had an interest in "any retirement plan, and in any annuity or lump sum payment paid to either party" in accordance with the formula established in *Sims v. Sims*.[1]  Both parties worked for the Calcasieu Parish School Board (CPSB), Mrs. Sullivan as a teacher and Mr. Sullivan as a principal. In June 1995, Mr. Sullivan retired and entered into DROP.

"The DROP program is an optional method of retiring whereby an employee changes his status in the state retirement system from 'active member' to 'retiree' but continues to work at his regular job while he accumulates money in an individual DROP account based on the amount he would have received as a monthly retirement benefit had he in fact retired."[2]  An employee may participate in DROP for up to three years.

Mr. Sullivan's retirement funds went into that account, drawing interest over the three year period. On September 15, 1999, he withdrew $92,354.47 of the $108,541.45 in the account and rolled it into an individual retirement account (IRA). After repeated amicable demands, Mrs. Sullivan filed a rule to establish her share in

---

[1]358 So.2d 919 (La.1978).

[2]*Sullivan v. Sullivan*, 01-06, pp. 1-2 (LaApp. 3 Cir. 6/13/01), 802 So.2d 1093, 1094.

1

his retirement benefits. The parties stipulated that Mrs. Sullivan's interest in his retirement benefits under the *Sims* formula was 31 percent. However, Mr. Sullivan argued that the DROP funds should not be included because they were his separate property. The trial court agreed with him. However, this court reversed its judgment because it was contrary to our supreme court's holding in *Bailey v. Bailey*.[3]

On April 30, 2002, Mrs. Sullivan filed a "Rule to Require Defendant to Pay Percent of DROP Account." The court heard the rule on June 30, 2002. By the time of the June 30, 2002 hearing on the Rule, the IRA funds had diminished in value to $60,978.24. Mr. Sullivan urges us to value the DROP funds as of this date. Conversely, Mrs. Sullivan urges, and the trial court found, that the funds should be valued as of September 15, 1999, when the husband made his first withdrawal from the account. Mr. Sullivan appeals. Thus, the central question before us is at what point in time the DROP funds should be valued.

**VALUATION DATE**

Louisiana Revised Statutes 9:2801(4)(a) mandates that the court "*value the assets as of the time of trial on the merits*, determine the liabilities, and adjudicate the claims of the parties." (Emphasis added.) However, "[u]se of the 'fixed percentage' method [such as the *Sims* formula] does not require valuation of the pension."[4]

Our supreme court in *Sims v. Sims*[5] discussed the unique situation pension plans which have not matured at the date of dissolution create, stating:

> [T]he community interest in the retirement plan has no immediate redeemable cash value. Until the employee is separated from the service, dies, or becomes disabled, no value can be fixed upon his right to receive an annuity or upon lump-sum payments or other benefits to be paid on his account.
>
> Nevertheless, . . . *the wife is entitled to a declaration at this time of the interest attributable to the community of any such payments, if and when they become due in the future.* (Emphasis added.)

---

[3] 97-1178 (La. 2/6/98), 708 So.2d 354.

[4] *Blanchard v. Blanchard*, 97-2305, p. 7 (La. 1/20/99), 731 So.2d 175, 179.

[5] 358 So.2d 919, 922-23 (La.1978).

2

Accordingly, the supreme court in *Sims* articulated a formula to be used in calculating retirement plan benefits which had not matured at the time of partition. As a general rule, the percentage is based on a fraction arrived at by dividing the length of time worked under the plan during the marriage by the total length of time worked towards earning the pension. The non-employee spouse is entitled to the above percentage of any future payments the employee spouse receives under the plan, payable *as, if, and when* payable to the pensioner.[6] Accordingly, when a court partitions retirement benefits using the fixed percentage method, it does so *in lieu of* determining its value.[7]

The *Sims* formula is *a* method, but not the exclusive one, a court may use to partition retirement benefits.[8] Alternatively, a court may assign a present cash value to the benefits at the time of dissolution and award the non-employee spouse a lump sum or property of equivalent value or use a variation of the *Sims* formula as the specific circumstances require.[9] Any such decision constitutes the partition of the benefits. The supreme court fashioned the *Sims* formula to obviate the need for a supplemental partition at the time the benefits come due.[10] Once a court adjudges partition according to the *Sims* formula, the only remaining step is to apply the formula at the time of the employee spouse's separation from employment when the benefits come due.[11] Because the formula establishes the non-employee spouse's portion at the same time benefits are paid to the employee spouse, there is no need for the court to assign a value to the benefits.[12] The employer is instructed to pay the non-employee spouse's portion directly to him or her, usually pursuant to a Qualified Domestic Relations Order (QDRO).[13]

---

[6]*Id.*

[7]*See Hare v. Hodgins*, 586 So.2d 118 (La.1991).

[8]*Id.*

[9]*Id.*

[10]*See Sims*, 358 So.2d 919.

[11]*Id.*

[12]*Blanchard*, 731 So.2d 175.

[13]*Id.*

The problem in the instant case arises because Teacher's Retirement System of Louisiana (TRSL) does not accept QDROs and, instead of cooperating with Mrs. Sullivan in executing an acceptable division order, Mr. Sullivan began withdrawing the funds, including his former spouse's portion. But for his refusal to execute a division order, there would never have been a need to place a total value on the funds.

This court has previously determined that "the funds deposited into Mr. Sullivan's DROP account are directly attributable to Mr. Sullivan's employment and retirement contributions prior to the termination of the community and, thus, *are part of his retirement benefits*."[14] (Emphasis added.) Clearly, then, the DROP account funds were included in the 1990 partition judgment of "any retirement plan, and in any annuity or lump sum payment paid to either party." The only remaining step was to apply the *Sims* formula *at the time the benefits were payable or paid* to Mr. Sullivan.

"Until the employee is separated from the service, dies, retires, or becomes disabled, no value can be fixed upon his right to receive an annuity or upon lump-sum payments or other benefits to be paid on his account."[15] "Disposition of pension rights under this method involves recognition of the right of the non-employee spouse to a judgment recognizing his interest in proceeds from a retirement plan, 'if, as, and when' they become payable[.]"[16] Thus, while the percentage is fixed at the time of partition, the value of the benefits is automatically fixed when the employee spouse retires.

After the three-year DROP period, the funds cease to earn interest and simply remain in the account until the employee leaves employment. Because the DROP account stopped accruing interest after the three year period, its value should not have changed from the point of his retirement, the date that signifies Mrs. Sullivan's entitlement to her share of the funds, until his first withdrawal. Accordingly, we find no error in the trial court's valuation as of the date of Mr. Sullivan's first withdrawal.

---

[14]*Sullivan*, 802 So.2d at

[15]*Sims*, 358 So.2d at 923.

[16]*Blanchard*, 731 So.2d at 179.

On April 30, 2002, Mrs. Sullivan brought a "Rule to Require Defendant to Pay Percent of DROP Account." During the hearing of this rule, Mr. Sullivan presented evidence that the current value of the funds was $60,978.24. He attempts to characterize the hearing on this Rule as a trial on the merits of a supplemental partition. On this date, the pension had already matured. In a supplemental partition of a pension which has already matured, its value *can be* determined because the benefits are already in existence. In such a case, La.R.S. 9:2801(4)(a), which instructs the court to "value the assets as of the time of trial on the merits," has a straight-forward application and the benefits are valued at the time of trial on the merits of the partition.

Nevertheless, we cannot agree that the June 30, 2003 proceedings constituted a trial on the merits of the partition. Instead, the Rule was Mrs. Sullivan's final attempt to obtain an acceptable division order to enforce the 1990 partition judgment.

Specifically, Mr. Sullivan entered DROP in June 1995 and participated for the full three years the DROP program allows, until June 1998. After those three years, he continued to work for a little less than a year and retired. On May 27, 1999, Teachers' Retirement System of Louisiana sent him the following letter, with a courtesy copy to Mrs. Sullivan:

> Dear Mr. Sullivan:
>
> Teachers' Retirement System of Louisiana (TRSL) has been informed that you have, or soon will, terminate both your employment and your Deferred Retirement Option Plan (DROP) participation. Since your file indicates you became divorced or legally separated while a member of TRSL, you should be aware of the following.
>
> Retirement has been held to be community property in Louisiana. See Sims v. Sims, 358 So.2d 919 (La. 1978); Hare v. Hodgins, 586 So.2 118 (La. 1991). *Therefore, your ex-spouse probably has a claim to a portion of your retirement benefits and DROP withdrawals.* However, since TRSL has not received a certified copy of a court order directing it to pay a portion of your retirement benefits and/or DROP withdrawals directly to your ex-spouse, Louisiana law requires TRSL to pay the entire amount of the retirement and DROP withdrawals to you alone. See La. Revised Statutes 11:291(E) and 761 et seq. Payment so made will absolve TRSL of any responsibility to account to your ex-spouse, and you will be solely responsible for any claim your ex-spouse may subsequently bring.

In making the above statement, I am aware of the Judgment on Community Property dated December 7, 1990, which recognizes your ex-spouse's interest in any retirement plan you may have. However, since that Judgment does not meet the requirements for an acceptable division order, TRSL cannot divide funds or benefits with your ex-spouse based upon it.

If you and/or your ex-spouse intend TRSL to pay a portion of your retirement benefits and/or DROP withdrawals directly to your ex-spouse, you will need to go into court and obtain a court order directing TRSL to do so. This court order must state the exact amount (which is usually expressed as a percentage) of your retirement benefits and/or DROP withdrawals to be sent to your ex-spouse or an exact formula from which the amount may be calculated. If a formula is stated, it must be reasonably specific; a simple statement that the Sims formula or some other such formula is to be applied will not be sufficient for TRSL's purposes. The court order must also make it clear what types of funds or benefits (e.g., monthly retirement benefits, DROP withdrawals, survivor benefits and/or payments to beneficiaries) TRSL is to divide with the ex-spouse and it must include yours and your ex-spouse's names and current addressess. Since the Federal provisions on Qualified Domestic Relations Orders (QDRO) do not apply to TRSL or any other governmental retirement plan, the order cannot purport in any way to be a QDRO. A certified copy of the order must be sent to TRSL, together with a copy of your ex-spouse's social security card.

I am returning your file to the appropriate department for further processing in relation to your termination of employment and DROP participation. If you or your attorney have any questions about the above, or would like to see an example of an acceptable division order, please feel free to contact me. . . [.]

(Emphasis added.)

After receiving a copy of this letter, Mrs. Sullivan's attorney began attempts to obtain an "acceptable division order" to receive her share of the retirement benefits partitioned in the 1990 judgment. On July 21, 1999, her attorney sent Mr. Sullivan's attorney the following letter:

I apologize for the delay in sending you this confirmation letter but as you know we have spoken on more than one occasion concerning Paige Sullivan's interest in Chuck's retirement with the Louisiana Teacher's Association. In past communication I informed you that we calculated Paige's interest at 31% and also sent a letter confirming the monthly benefits being paid to your client. Our most recent conversation concerned the "Drop Program" and my client's 31% interest in the proceeds to be received by Chuck in the future from that program.

6

[I] must insist that we either reach an amicable joint stipulation and consent judgment concerning Paige's interest or I will be forced to file something so we can get this matter concluded. . . . [.]

Notwithstanding Mrs. Sullivan's multiple amicable demands for her share of the retirement benefits, including those in DROP, and TRSL's notification that she "probably has a claim to a portion of your retirement benefits and DROP withdrawals," Mr. Sullivan, unilaterally and without Mrs. Sullivan's knowledge, began withdrawing the DROP funds on September 15, 1999.

When Mrs. Sullivan learned of his withdrawals, she obtained an injunction to prevent TRSL from distributing any more of the funds. However, he had already withdrawn the majority of them. After Mrs. Sullivan's amicable demands proved futile, she sought to enforce the 1990 partition judgment through a Rule to establish her interest in the funds. At that time, the parties stipulated that Mrs. Sullivan's percentage, using the *Sims* formula, was 31 percent. However, Mr. Sullivan maintained that he believed the DROP funds to be his separate property, despite TRSL's notification that his ex-spouse probably had a claim to a portion of them and Mrs. Sullivan's repeated assertions of her entitlement to her share of the funds during the four months preceding his first withdrawal. Mrs. Sullivan maintained that the DROP funds were retirement benefits, which they had partitioned in 1990.

Mr. Sullivan urges that because DROP had not been legislatively created at the time of the original partition, it could not be valued as of that date and, thus, was omitted from the original partition. However, the fact that DROP did not exist at the time of dissolution is of no moment. In *Bailey*, our supreme court stated:

If Mr. Bailey had actually retired on the date he entered the DROP program, Mrs. Bailey clearly would have had the right to share, in the stipulated percentage, in the retirement benefits he would have received. The fact that the same amount of monthly retirement benefits was credited to a deferred-receipt account under a fictitious retirement for a specific period should not change that result.[17]

Furthermore, neither did his entitlement to *any* retirement benefits exist at the date of dissolution. As our supreme court has pointed out:

_____

[17]*Bailey*, 708 So.2d at 358.

7

When acquired during the existence of a marriage, the right-to-share in a retirement plan is a community asset which, at the dissolution of the community, must be so classified even though at the time acquired or at the time of dissolution of a community, the right has no marketable or redeemable cash value, *and even though the contractual right to receive money or other benefits is due in the future and is contingent upon the happening of an event at an uncertain time.*[18]

. . . .

[O]ur courts have uniformly held that, *at the dissolution of the community*, the non-employed spouse is entitled to judgment recognizing that spouse's interest in proceeds from a retirement annuity, or profit-sharing plan or contract, *if and when they become payable*, with the spouse's interest to be recognized as one-half of any payments *to be made*, insofar as they are attributable to the other spouse's contributions or employment during the existence of the community.[19]

(Emphasis added.)

Additionally, this court's previous opinion in this matter is not what not created Mrs. Sullivan's legal entitlement to the DROP funds; rather, the opinion simply recognized the DROP funds to be part of Mr. Sullivan's retirement benefits, as well as Mrs. Sullivan's interest in them, which the 1990 partition judgment had established. Our previous decision confirmed that our supreme court's decision in *Bailey v. Bailey* clearly established that DROP funds are considered retirement benefits, apportionable in accordance with *Sims*.

In *Sims*, the very case that established the formula, the employee spouse had not yet retired at the time of the trial on the merits of the partition. Thus, the supreme court established the formula but could not calculate the percentages at that time because the spouse had not retired. Accordingly, it simply ordered that the benefits be partitioned in accordance with the formula it announced in its opinion. It concluded, "[t]he community's dissolution before [the date benefits become payable] does not substitute for the employee's retirement (or separation or death) as the event which fixes the employer's liability and which causes payments to become due. When

---

[18]*Sims,* 358 So.2d at 922 (quoting *T. L. James & Co., Inc. v. Montgomery*, 332 So.2d 834 (La.1976)).

[19]*Id.* at 922.

they *do* become due, however, so as then to have a determinate value, the non-employed spouse is entitled to receive the proportion of them recognized by this judgment [*Sims* formula] as attributable to the other spouse's employment during the existence of the community."[20]

The 1990 judgment in the instant case placed Mr. and Mrs. Sullivan in the same position as the parties in *Sims*. Moreover, even if we agreed with Mr. Sullivan that the June 30, 2002 proceeding was a supplemental partition, he still had a duty under La.Civ.Code art. 2369.3 to "preserve and manage prudently former community property under his control [and] is answerable for any damage caused by his fault, default or neglect." Thus, even accepting his erroneous characterization of the proceedings, the trial court would have had discretion to value the funds as is it did based on its finding that he had failed in his duty to prudently care for and preserve the former community property.

Accordingly, we affirm the trial court's ruling that Mrs. Sullivan is entitled to her share of $108,541.45, the value of the funds upon Mr. Sullivan's first withdrawal.

**LEGAL INTEREST**

Regarding legal interest, the actual judgment states that Mr. Sullivan owes legal interest "on the above mentioned award as of November 29, 1990," the date of the actual judgment of partition. Then, Judge Bradbury crossed out November 29, 1990, wrote September 29, 1999, and initialed it. As we noted above, September 29, 1999 was the date that Mrs. Sullivan brought her first Rule to require Mr. Sullivan to sign the order to allow her to receive her share of the funds. Thus, this was the date of judicial demand, and the trial court correctly assessed legal interest from this date.

**CONCLUSION**

For the foregoing reasons, we affirm the trial court's judgment in all respects and assess the costs of this appeal to Mr. Sullivan.

**AFFIRMED.**

---

[20]*Id*. at 924.

9

**PAIGE B. SULLIVAN**

**VERSUS**

**CHARLES P. SULLIVAN**

THIBODEAUX, C.J., dissenting.

Louisiana Revised Statutes 9:2801 provides the rules for judicially partitioning community property when the spouses are unable to agree. Louisiana Revised Statutes 9:2801(4)(a) states: "[t]he court *shall value the assets as of the time of trial on the merits,* determine the liabilities, and adjudicate the claim of the parties." (Emphasis added). Thus, according to the language of La.R.S. 9:2801(4)(a), the court should determine the value of the community assets as of the date of the trial on the merits. The trial court reasoned that because the original trial on the partition of the community property took place on February 14, 1990, and a judgment awarding Ms. Sullivan an interest in any of Mr. Sullivan's retirement plans, was filed on December 11, 1990, trial on the merits of the DROP account funds occurred in 1990. Therefore, the trial court gave the funds in the DROP account the value it had at the time Mr. Sullivan rolled the funds over to the Merrill Lynch account. I disagree with the trial court's and majority's conclusion as to when a trial on the merits partitioning *this* community asset occurred which triggered valuation of the DROP account funds.

In *Edwards v. Edwards*, 35,953, p. 3 (La.App. 2 Cir. 5/8/02), 817 So.2d 414, 416, the court noted:

> After termination of the community property regime, the provisions governing co-ownership apply to former community property. La.C.C. art. 2369.1. Any co-owner has a right to demand partition of a thing held in indivision. La.C.C. art. 807.
>
> Further, La.C.C. article 1308 provides:
>
> If, after the partition, a discovery should be made of some property not included in it, the partition must be amended or made over again, either in totality, or of the discovered property alone.
>
> The omission of a thing belonging to the community from a partition is, therefore, grounds for a supplemental partition. La.C.C. arts. 1380 and 1401; *Moreau v. Moreau*, 457 So.2d 1285 (La.App. 3d Cir.1984).

At the original termination of the community in 1990, the option for school board employees to enter into DROP did not exist. After termination of the community, when DROP came into existence, Mr. Sullivan chose to participate. Funds in that account were omitted from the original community property partition by virtue of its nonexistence at that time. However, Ms. Sullivan did not file a supplemental partition of that property. Instead, on September 29, 1999, she filed a rule to determine her interest in Mr. Sullivan's "Teacher Retirement System." On May 4, 2000, the rule was tried and the parties stipulated that Ms. Sullivan's interest in Mr. Sullivan's teacher retirement funds was thirty-one percent. In her pleadings, Ms. Sullivan did not request a partition or valuation of the DROP funds. On July 21, 2000, the trial court rendered a ruling that the DROP funds were not community property. Ultimately, on June 13, 2001, this court determined that the DROP account funds were community property to which Ms. Sullivan was entitled a percentage. *Sullivan v. Sullivan*, 01-6 (La.App. 3 Cir. 6/13/01), 801 So.2d 1093. Writs to the

2

supreme court were denied. A rule filed on April 30, 2002 requesting that Mr. Sullivan pay Ms. Sullivan her percentage interest in the DROP account was tried on June 30, 2002. Therefore, in accordance with La.R.S. 9:2801(4)(a), the effective date for the determination of the value of the DROP account funds was June 30, 2002.

Further, in *Preis v. Preis,* 94-442 (La.App. 3 Cir. 11/2/94), 649 So.2d 593, *writs denied*, 94-2939, 94-2942 (La. 1/27/95), 649 So.2d 392, the valuation of the husband's stock in a professional law corporation was at issue. Three years after the 1990 termination of the community that existed between the parties, an action for partition of that property was tried in 1993. The value of the stocks had increased from its 1990 value. The husband presented evidence of the stock's value as of 1990, the wife presented evidence of the stock's value as of 1993, two months prior to the partition trial. The trial court valued the stocks as of the time the community was terminated, using the husband's 1990 evidence. The husband in *Preis* contended, as does Ms. Sullivan in the present appeal, that La.R.S. 9:2801 (4)(a) "means that the assets of the community *as they existed at the date of termination of the community* are to be valued at the time of trial of the partition." *Id.* at 594. In *Preis*, this court understood the husband's method of valuing community property as "first giv[ing] value as of the date of termination" and to reevaluate the property to determine how the value has changed "by the passage of time between termination of the community and trial of the partition." *Id.*

The trial court in *Preis* accepted the method of community property asset valuation above as urged by the husband; however, on appeal, this court concluded that the husband's proposed method "ignores the actual value of the asset 'as of the trial on the merits,'" and did not agree with his method. *Id. See also*, *Barr v. Barr*, 613 So.2d 1159 (La.App. 5 Cir. 1993) (trial court valued the parties' IRA accounts

3

as of the date of the partition trial); *Stewart v. Stewart*, 585 So.2d 1250 (La.App. 4 Cir. 1990), *writs denied*, 590 So.2d 594, 597 (La.1992) (the trial court, faced with valuing the husband's medical practice, used the value closest in time to the date of trial as urged by the wife). We stated in *Razzaghe-Ashrafi v. Razzaghe-Ashrafi*, 558 So.2d 1368, 1371 (La.App. 3 Cir. 1990), quoting *Queenan v. Queenan*, 492 So.2d 902 (La.App. 3 Cir.), *writ denied*, 496 So.2d 1045 (La.1986) that:

> The purpose of . . . [9:2801(4)(a)] is to provide an occasion for the court to get a handle on the situation. It does not mean that the court is frozen by any statutory time level or particular valuation at any particular time or for any particular purpose, but simply to place values on the assets for the purpose of accounting, allocation, and adjudication in accordance with the further provisions of R.S. 9:2801(4)(b, c, d and e).

Thus, it appears that the trial court's discretion valuing community assets extends to using a value other than the value as of the date of trial. However, closer inspection of *Razzaghe-Ashrafi* and *Queenan* reveals that the trial courts had limited evidence or no evidence at the partition trial with which to make a valuation. In the present case, there was no doubt about value of the funds that were in the DROP account as of the date of trial. Therefore, the proper time frame for valuing the DROP account funds in the present case is the value of the funds at the time of trial. The trial court and the majority err in using value of the DROP account as it existed in September 15, 1999, the date Mr. Sullivan transferred the funds from the DROP account to the Merrill Lynch account.

Moreover, in my view, the majority's reliance on *Sims v. Sims*, 358 So.2d 919 (La.1978) and *Bailey v. Bailey*, 97-1178 (La. 2/6/98), 708 So.2d 354 is tenuous. Both *Sims* and *Bailey* involved situations where retirement accounts had already been established when the community was terminated. That is not the situation here. DROP was not in existence when the Sullivans' community was partitioned in 1990.

4

Further, in *Sims*, the funds were in existence but had not yet matured. Again, that is not the situation in this case.

### *Legal Interest*

The September 1999 filing did not seek to establish the value of the DROP account. It only established Ms. Sullivan's entitlement to funds in the teacher's retirement system. In *Reinhardt v. Reinhardt*, 99-723, p. 4 (La. 10/19/99), 748 So.2d 423, 425, the supreme court, quoting from its earlier decision in *Sharbono v. Steve Lang & Son Loggers*, 97-110 (La. 7/1/97), 696 So.2d 1382, reaffirmed the difference between pre-judgment and post-judgment interest:

> The world of legal interest may be divided into two hemispheres. Prejudgment interest, which stems from the damages suffered by the victorious party, is meant to fully compensate the injured party for the use of funds to which he is entitled but does not enjoy because the defendant has maintained control over the funds during the pendency of the action. . . . . In contrast, postjudgment interest is a prospective award whose purpose is to encourage prompt payment of amounts awarded in the judgment, and to compensate the victorious party for the other party's use of funds to which the victor was entitled under the judgment.

Ms. Sullivan argues that *Reinhardt* is applicable in a case where only "equalizing payments" are involved, which can not be calculated before final judgment is rendered. While Ms. Sullivan is correct, the basis of the court's holding, that interest should be applied post-judgment, is that the winning party was not entitled to the funds until adjudged to be so entitled. "In other words, in cases ex delicto and ex contractu, 'prejudgment interest' is awarded to make an injured party whole by compensating that party for the time-value of money to which that party was entitled from the date set by the legislature, but over which the defendant, in retrospect, had wrongfully continued to exercise dominion and control while the suit was pending." *McLaughlin v. Hill City Oil Company/Jubilee Exxon*, 97-577, p. 18

5

(La.App. 3 Cir. 10/8/97), 702 So.2d 786, 797, *writ denied*, 97-2797 (La. 2/13/98), 706 So.2d 994. In personal injury or contract cases, damages are ascertainable from the date that a person is injured or a contract breached. However, valuation of community property in a partition trial as well as percentage of the respective parties' interest in that property is not ascertainable until awarded by the court. Thus, interest thereon runs only from the date of judgment. *Sharbono*, 696 So.2d 1382. In this case, that date is November 26, 2003.

For the foregoing reasons, I dissent.